UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| S.H., individually and on behalf of minor O.H.,<br><br>Plaintiffs,<br><br>v.<br><br>SNAP, INC.; and Glenn Walter,<br><br>Defendants. | NO.:<br><br>COMPLAINT AND DEMAND FOR JURY TRIAL |

**COMES NOW** Plaintiffs S.H., individually and on behalf of minor daughter O.H., by and through their attorneys, Social Media Victims Law Center, and state the following claims for relief:

**PRELIMINARY STATEMENT**

1. This is a sexual assault dispute under 9 U.S.C. § 402 for violation of federal and state statutes protecting children from sexual exploitation brought under 18 U.S.C. § § 2255, RCW 9A.82.100, and RCW 9.68A.130 as well as an action for personal injuries under Washington law.

2. O.H. was 11 or 12 years old when Defendant Snap, Inc. manipulated her to download its Snapchat product onto her mobile phone without her parents' knowledge or consent and connected her to Defendant Glenn Walter, a known sex predator. Snap vouched for Walter


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

as a "friend" that O.H. could trust while furnishing Walter the online tools to effectuate her sexual exploitation. Snapchat's product features enabled Walter to conceal his age, identity, and malign intent; gain O.H.'s trust; groom her to submit to his prurient demands; and discover her geographic location and use this information to extort her to create and send sexually explicit images of herself across state lines. O.H. sustained an indivisible harm from Snap's and Walter's concerted action and Defendants are jointly and severally liable for her injuries.

3. The grievous harms inflicted on O.H. were not an isolated incident. Rather, Snapchat's product features make it inherently dangerous for young users and a bastion for online sexual abuse. Snapchat is the preferred app of child sex predators worldwide with 80 percent of online sexual grooming occurring on Snapchat. Nevertheless, Snap provides public assurances that Snapchat is safe for children as young as 12 while privately targeting much younger kids to download its product. Snap knows that Snapchat's features facilitate child sex abuse, yet Snap refuses to implement known and feasible design changes that will materially reduce this worldwide scourge.

4. Plaintiffs do not base their claims on allegations that Snapchat was designed to be addictive to minors. Rather, this lawsuit is about Snap's knowing facilitation of child sexual abuse and concerted action with Glenn Walter to perpetrate the sexual exploitation of O.H.

## PARTIES

5. Plaintiff S.H. is O.H.'s parent, and resides in Spokane County, Washington.

6. S.H. has not entered into a User Agreement or other contractual relationship with Snap in connection with O.H.'s use of any Snap product and hereby disaffirms any such agreements her minor child may have ostensibly entered into related to arbitration, forum selection, choice of law, or class-action waiver. O.H. likewise disaffirms any such agreements and has ceased her use of Snapchat.

7. Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, California. Snap owns and operates the Snapchat social media platform which Snap distributes and makes widely available to users in the State of Washington. Snap manages


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

its Washington State operations from offices located in Bellevue, Washington.

8. Defendant Glenn Walter is a resident of Louisiana.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over this action under to 28 U.S.C. § 1332 because Plaintiffs reside in Washington state; Snap is incorporated in Delaware with its principal place of business in California; Glenn Walter resides in Louisiana; and the amount in controversy in this case exceeds $75,000.

10. The Court may exercise specific jurisdiction over Snap because Snap purposefully availed itself of the benefit of transacting business in Washington state and Plaintiffs' claims arise out of and relate to Snap's activities in Washington. Snap advertises and encourages use of its Snapchat product in Washington; has supplied its Snapchat product to 2.4 million Washington residents; enters into thousands of contracts with Washingtonians; sends over 250 million notifications, Quick Add selections, Discover messages, and Spotlights to Washington citizens each year; and Snap actively collects personal data and geolocation information from Washington residents which it sells to third parties.

11. This Court has specific jurisdiction over Defendant Glenn Walter because he knowingly sought out children in the state of Washington to abuse and exploit including O.H. Walter directed his tortious and criminal conduct to the state of Washington, thereby availing himself of the jurisdiction of Washington courts.

12. Venue is proper in the Western District of Washington because Snap operates an office and transacts business in King County, Washington.

**FACTS**

**A. <u>Sex Predators Use Social Media Products to Groom Vulnerable Children</u>**

13. Child sexual abuse is an extreme public health problem and adverse childhood experience. Child sexual abuse refers to the involvement of a person less than 18 years old in illegal sexual activity that the child either does not consent to or is not capable of furnishing informed consent.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

14. According to the U.S. Centers for Disease Control and Prevention (CDC), approximately 1 in 4 girls and 1 in 20 boys in the United States experience child sexual abuse.[1] However, many children never report child sexual abuse, so these figures underestimate the true impact of the problem.

15. One method commonly employed by predators to gain a child's trust is called "grooming." Grooming describes a steady process of manipulation to convince the child to engage in sexual behavior.[2] Grooming occurs when a predator builds a relationship of trust and emotional connection with a child to sexually abuse, exploit, and traffic them. Grooming is a creeping process that develops over time—a characteristic that makes it particularly dangerous and difficult to detect in its early stages.

16. The International Centre for Missing and Exploited Children (ICMEC) has identified online grooming as one of the key global threats that puts "children at risk for sexual abuse and exploitation."[3] Predators frequently present themselves online as younger and with similar interests as their child victim. Less security-conscious than older users, children are particularly vulnerable to this form of manipulation—more readily forming trusting relationships and befriending strangers through interactions on social media.[4]

17. Online grooming often involves impersonation whereby predators create fake social media profiles and falsely present themselves as minors to befriend potential victims and gain their trust. This often serves as a precursor to sexual abuse, stalking, and harassment. Children are particularly vulnerable in this regard, as the design features of social media platforms routinely expose them to individuals whose real identities are unknown to them, a risk that platform manufacturers and developers are uniquely positioned to prevent.

---

[1] *Fast Facts: Preventing Child Sexual Abuse,* Centers For Disease Control And Prevention (May 16, 2024), https://www.cdc.gov/violenceprevention/childsexualabuse/fastfact.html (last visited November 1, 2026).
[2] Samantha Craven, et al., *Current Responses to Sexual Grooming: Implications for Prevention*, 46 HOWARD J. CRIM. AND JUST. 60, 61 (2007).
[3] International Centre for Missing & Exploited Children, Online Grooming of Children for Sexual Purposes: Model Legislation and Global Review 1 (2017), *available at* https://www.icmec.org/wp-content/uploads/2017/09/Online-Grooming-of-Children_FINAL_9-18-17.pdf (last visited November 1, 2026).
[4] *Id Id*. at 3.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

18. Predators use social media platforms and online forums frequented by minors and young people, often targeting multiple victims through mass friend requests and unsolicited contact. Human groomers use fake profile pictures, fabricated shared interests, and redirection to other platforms or private chats. Through the provision of gifts and flattery, these predators attempt to create a sense of familiarity and trust. Children are particularly susceptible to these tactics, as they lack the emotional maturity and life experience necessary to evaluate the authenticity of an online relationship.

**B. Background on Snap Inc. and Snapchat**

19. Snap is an American social media company founded in 2011 by three Stanford college students, Evan Spiegel, Bobby Murphy, and Reggie Brown.

20. Snap develops and maintains Snapchat, Spectacles, and Bitmoji, among other technology products.

21. Snapchat, originally called *Picaboo*, began as a simple smartphone-based application premised on disappearing messages, a feature that remains foundational to its popularity today.

22. Snapchat's concept arose from a 2010 incident in which Reggie Brown sent a tawdry photograph he later regretted. Brown told Evan Spiegel and Bobby Murphy that he wished there was a way to send photographs that disappeared after being viewed. Spiegel recognized this as "a million-dollar idea" and went on to become one of the youngest billionaires in the world as a result.[5]

23. Spiegel, Brown, and Murphy sought to create a platform to facilitate conversations and activities that people did not want to exist in digital perpetuity, including, by their own account, underage drinking and sexual activity. As Spiegel noted, "[t]he norm of the internet age is to create platforms in which everything is saved—everything is stored and documented

[5] Avery Hartmans & Paige Leskin, *The life and career rise of Snap CEO Evan Spiegel, one of the youngest billionaires in the world*, Business Insider (Jan. 29, 2020), https://www.businessinsider.com/fabulous-life-and-career-of-snap-ceo-evan-spiegel.



Social Media Victims Law Center
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

digitally. Snapchat went the opposite direction."[6]

24. The celebrated origin stories of Snapchat illustrate how transmission of illicit and illegal activity free of consequences was central to Snapchat's design purpose. As an officer of Kappa Sigma fraternity at Stanford in 2009 and 2010, Spiegel used traditional email and social media to discuss "making 300 Jell-O shots to get sorority girls drunk, urinating on one conquest and shopping for cocaine and marijuana."[7] Other emails ruminate on fraternity pledge parties fueled by illegal drugs and underage drinking and lauded the resulting sexual conquests.[8]

25. Spiegel's communications promoting the purchase of illegal drugs and alcohol to ply upon minors for purposes of sexual conquest occurred contemporaneously with his design of Snapchat.

26. Snapchat's original raison d'être was to facilitate and provide cover for illicit and illegal sexual activity, including the transmission of nude photographs. One of Snapchat's most robust value propositions is its ability to provide users with a means of sending photographs, messages, and videos that disappear. The initial iteration of the application was designed with a focus on preventing users from taking screenshots, among other evidence-destruction features.

27. Early feedback confirmed that people could not conceive of any legitimate reason users would need or want to destroy evidence of their online activities outside of illicit and/or otherwise problematic behavior. "Everyone said, 'That is a terrible idea,'" Spiegel recalls. "'Not only is nobody going to use it, they said, but the only people who do, will use it for sexting.'"[9] Snap's founders also designed Snapchat to destroy data on the backend, rendering critical

---

[6] Gary Vaynerchuk, *The Snap Generation: A Guide To Snapchat's History* (Jan. 28, 2016), https://www.garyvaynerchuk.com/the-snap-generation-a-guide-to-snapchats-history/.

[7] Andrea Chang, *Snapchat CEO Evan Spiegel 'mortified' by leaked frat emails*, Los Angeles Times (May 28, 2014), https://www.latimes.com/business/technology/la-fi-tn-snapchat-evan-spiegel-20140528-story.html (last visited November 1, 2026).

[8] *Id.*

[9] Jacob Goldberg, *How Evan Spiegel transformed a "terrible idea" into the Snapchat generation*, CEO Magazine (June 10, 2020), https://www.theceomagazine.com/business/coverstory/snapchat-evan-spiegel/ (last visited November 1, 2026).According to Mr. Spiegel, the idea for Snapchat was met with questions. Specifically, "[m]any wondered why anyone would want to send a disappearing photo." J.J. Colao, *The Inside Story of Snapchat: The World's Hottest App Or A $3 Billion Disappearing Act?*, Forbes (Jan. 6, 2014), https://www.forbes.com/sites/jjcolao/2014/01/06/the-inside-story-of-snapchat-the-worlds-hottest-app-or-a-3-billion-disappearing-act/?sh=3c52f29467d2 (last visited November 1, 2026).



Social Media Victims Law Center
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

information inaccessible to law enforcement.

28. Following its launch in 2011, Snap intended to market Snapchat to target mature audiences for its most obvious purpose —as a sexting tool. A draft press release indicated, "Picaboo lets you and your boyfriend send photos for peeks and not keeps!"[10] Months after its launch, however, *Picaboo* had amassed only 127 users.[11] The founders rebranded the product to Snapchat and began marketing to and targeting high school students.[12] Snap's founders made a deliberate decision to target and market their product to children because they determined it would be more profitable to do so.[13] Within one year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

29. In 2012, Snapchat launched on Android and added video capabilities, increasing the number of "snaps" to 50 million per day.[14]

30. In 2013, Snap added its "Chat" and "Stories" design features—skyrocketing its popularity among American youth and "changing the face of social media timelines forever."[15] That same year, Instagram launched Instagram Direct in an effort to compete with Snapchat's

---

[10] Colao, *supra* note 9. *See also* Nick Bilton, *Disruptions: Indiscreet Photos, Glimpsed Then Gone*, THE NEW YORK TIMES (May 6, 2012), https://archive.nytimes.com/bits.blogs.nytimes.com/2012/05/06/disruptions-indiscreet-photos-glimpsed-then-gone/?_r=0 ("The app's description in the Apple App Store does not mention sexting. But the accompanying images are of scantily clad women, and Apple has designated the app as being for users 12 and older, warning of 'mild sexual content or nudity.' Mentions of the app on Twitter indicate that many young people use it for photo-based banter with friends, though there are references to its less innocent potential.") (last visited November 1, 2026).

[11] *The History of Snapchat and the Future of Disappearing Photo Apps,* FROZEN FIRE, https://frozenfire.com/history-of-snapchat/ (last visited November 1, 2026).

[12] *See* Colao, *supra* note 9 (explaining that by fall of 2011, Snap's founders noticed that its userbase were school-aged kids who used the app primarily between the school hours of 9:00 a.m. and 3:00 p.m.).

[13] *Id.*

[14] Brian O'Connell, *History of Snapchat: Timeline and Facts*, THE STREET (Feb. 28, 2020), https://www.thestreet.com/technology/history-of-snapchat (last visited November 1, 2026).

[15] FROZEN FIRE, *supra* note 11; *see also, e.g.*, Nick Routley, *Timeline: Looking Back at 10 Years of Snapchat*, VISUAL CAPITALIST (July 18, 2021) (last visited November 1, 2016) ("… the concept of stories is perhaps the most significant contribution to the digital landscape. Disappearing short-form videos started off as a messaging tool, but ended up transforming the way people share their lives online."); *see also, e.g.*, Vaynerchuk, *supra* note 6 ("This update marked Snapchat's first big move into becoming a major platform by creating its own social language and context. It already had functionality very different from any other social network at the time … But after Stories the platform began to take off and mature as a content destination."); Awrara Ra, *The curious history of Snapchat and its increasing importance for businesses*, BUSINESS CHIEF (May 19, 2020), https://businesschief.com/digital-strategy/curious-history-snapchat-and-its-increasing-importance-businesses ("parents and other members of older generations have a dominant presence on Facebook, causing younger users to seek out a new platform. Snapchat came on the scene at just the right time.") (last visited November 1, 2026).


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

photo messaging platform, prompting Snap to introduce filters, timestamps, temperature and speed overlays, and Snap replays.[16]

31. In 2014, Snap added text conversations, live video chat capabilities, "Our Story," Geofilters, and Snapcash. The Chat feature allows users to talk to one another in the chat window via live video chat.[17] Snap made it in such a way as to be particularly appealing to predators as it generates no call logs or message trails that can be accessed by parents or law enforcement. Snap does not restrict any of these features to adult users, nor does it widely advertise their existence to parents.

32. By 2015, Snapchat had over 75 million monthly active users and was one of the most popular social media applications amongst American teenagers by both user count and time spent on the platform.

33. That same year, Snap introduced Discover ("a fun and interactive source of content from media partners such as National Geographic, Comedy Central, CNN, and more"),[18] QR code incorporation, facial recognition software, and "hilarious animated selfie lenses."[19] With the launch of its monetization strategy, advertisements accounted for 99% of Snap's total revenue.[20]

34. In 2016, Snap introduced Memories, Groups, and the My Eyes Only fully encrypted data vault product. The same year, Instagram launched its own "Stories" product, directly copying Snapchat's "Stories" product introduced in 2013 due to its popularity amongst teens and young adults.[21]

35. Today, Snapchat has 493 million daily active users worldwide and 92 million daily active users in North America. Snap's CEO Evan Spiegel told Congress in January 2024 that approximately 20 million U.S. teenagers use Snapchat.

---

[16] FROZEN FIRE, *supra* note 11.
[17] O'Connell, *supra* note 14.
[18] FROZEN FIRE, *supra* note 11; *see also* Vaynerchuk, *supra* note 6 (the Discover product a company "in a very aggressive place within the overall user interface of the app and delivers an unmatched form of attention from their youthful user base.").
[19] FROZEN FIRE, *supra* note 11.
[20] O'Connell, *supra* note 14.
[21] *See, e.g.*, FROZEN FIRE, *supra* note 11; Routley, *supra* note 15.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

36. Snap earned $5.93 billion total revenue in 2025, an 11% increase from 2024**.** Snap reported $3.128 billion in United States revenue through June 2026, a 15% increase from 2024. In 2023, Snap reported $437 million in global revenue from minors.

**C. <u>Snapchat is a Product</u>**

37. Snapchat is treated as a product by ordinary consumers, and Snap has consistently acknowledged that Snapchat is a "product." For example, Snap's 2022 Annual Report states "Our flagship product, Snapchat, is a visual messaging application that enhances your relationships with friends, family, and the world."[22] In public statements, Snap CEO Evan Spiegel has admitted that Snapchat is a product: "In terms of the execution, we have to continue to evolve and iterate the product to get the result we are looking for."[23]

38. Snap designed, coded, engineered, manufactured, produced, assembled, and placed Snapchat into the stream of commerce. Snapchat is made and distributed with the intent of being used and consumed by the public in the course of Snap's regular business. Snapchat is uniform and generally available to consumers. An unlimited number of copies can be obtained in Apple and Google stores, and it is available on the internet.

39. Snapchat is mass marketed in ways designed to appeal to the public and adolescents. As a result of these marketing efforts and Snapchat's design capabilities, Snapchat is used by millions of consumers.

40. Snapchat is akin to a tangible product for purposes of Washington law. Snap can be seen and heard. It takes up memory and depletes battery life. It can be turned on and off. It can be moved from one screen or device to another. When installed on a consumer's device, it has a definite appearance and location and is operated by a series of physical swipes and gestures. It is personal and moveable.

41. Downloadable software such as Snapchat is a "good" and is therefore subject to

---

[22] Snap Inc. Form 10-K at 6, *available at* https://s25.q4cdn.com/442043304/files/doc_financials/2022/q4/SNAP-2022.12.31-10K.pdf (last visited November 1, 2026).

[23] Recode Staff, *Full video and transcript: Snap CEO Evan Spiegel at Code 2018*, VOX (June 8, 2018), https://www.vox.com/2018/5/30/17397120/snap-ceo-evan-spiegel-transcript-code-2018.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

the Uniform Commercial Code. It is not simply an "idea" or "information."

42. Snapchat is available at two main retailers, Google Play and Apple's App Store. At these retailers, the copies of Snapchat available to the public are uniform and not customized by the manufacturer in any way.

**D. <u>Snap Exploits Adolescents' Incomplete Brain Development and Emotional Immaturity</u>**

43. The frontal lobes of the human brain—and particularly the prefrontal cortex—play an essential role in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses.

44. During adolescence, the brain matures in at least two primary ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, the brain undergoes "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change and develop to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

45. In late adolescence, important aspects of brain maturation remain incomplete, including those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. The part of the brain that is critical for control of impulses, emotional maturity, and decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

46. Snap programs, utilizes, and distributes Snapchat product features (including recommendation algorithms and hidden rewards) specifically designed to exploit young users' neurologic vulnerabilities, such as their diminished decision-making capacity, impulse control,



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

emotional maturity, and psychological resiliency.

47. Snap knows that as a result of minors' incomplete neurological development, minor users experience enhanced dopamine responses to stimuli on Snapchat and are substantially more likely to exercise poor judgment in their social media activity, act impulsively in response to negative social media encounters, and sustain physical and psychological harm through the use of its platform. Notwithstanding this knowledge, Snap knowingly designed Snapchat to maximize engagement among young users and failed to implement known safeguards to mitigate the neurological and psychosocial immaturity of such users.

48. Snap specifically targets children because of their neurologic and emotional vulnerabilities. By 2020, Snapchat was being used by an estimated 69% to 82% of all teens in the United States (aged 13 to 17)—though Snap estimates that number to be as high as 90%—and 34% of teens in the United States reported that Snapchat is their favorite of all the social media apps.[24]

**E. <u>Snap Targets Minors</u>**

49. According to the Pew Research Center, more teens send messages and posts on Snapchat than on TikTok or Instagram.[25] In 2026, 57% of teens send daily messages on Snapchat and 40% do so several times a day. Smaller shares of Instagram or TikTok users say this. And about 30% of teens on Snapchat report posting or sharing on the platform daily, including 17% who do this multiple times a day. About 20% report doing this on TikTok or Instagram every day.

[24] *See, e.g.*, *Snapchat Statistics*, SMART INSIGHTS (Mar. 18, 2020), https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/ (last visited November 1, 2026); Aran Ali, *Snapchat: The Most Popular Social Media Among U.S. Teens*, VISUAL CAPITALIST (Dec. 16, 2020), https://www.visualcapitalist.com/snapchat-the-most-popular-social-media-among-us-teens/ (hosting a graphic that shows "over 75% of the 13-34 year old U.S. population uses Snapchat" and stating that Snap "has emerged as the most popular social media app for U.S. teens") (last visited November 1, 2026).

[25] Pew Research Center, *Teens' Experiences on TikTok, Instagram and Snapchat* (April 15, 2026) https://www.pewresearch.org/internet/2026/04/15/teens-experiences-on-tiktok-instagram-and-snapchat/ (last visited November 1, 2026).



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862




50. Snap's targeting of minors is a deliberate corporate strategy. Snap targets minors because they represent Snap's most commercially valuable demographic, due both to their potential lifetime value and because their developmental vulnerabilities render them more susceptible to Snapchat's deceptive design features. Snap actively markets its platform to minors, misrepresenting that Snapchat is safe and appropriate for children and adolescents, and using cartoon ghosts and animals and silly filters that appeal specifically to minors.

51. According to Snap's internal analysis, the 13-to-17 demographic generates the highest average revenue per user ("ARPU") during the first 12 months following registration. A Snap senior product designer testified that acquiring a user at age 13 would "produce revenue for Snap at age 13, 14, 15, 16, 17, and 18, and then forward," whereas users joining later in life generate substantially less revenue. Additional Snap testimony and unsealed internal documents corroborate these findings:

a. Acknowledgement that "it's to Snap's benefit to onboard users as early as possible to maximize the amount of time that a user is in this 13 to 17 demographic where they are . . . the highest revenue-producing demographic on Snapchat";



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

b. Testimony from Snap Director of Product Management that when teenage users "start using Snapchat when they're 16 or 17, a really high proportion of them continue using that service";

c. Internal Snap presentations explicitly emphasizing the commercial importance of targeting the youngest permissible users, characterizing the cohort as "very valuable for advertisers" and noting that the "Snapchat Generation has $2 trillion in purchasing power, making up over 40 percent of global consumers";

d. Stating that "continuing to win with new 13 year olds is the most critical aspect to onboarding new users"; and

e. Acknowledgement that, through adolescents and teens, advertisers could reach their parents, because the "Ads [teens] saw on Snapchat influence what they asked for and what their parents purchased."

52. One example titled "Real Friends" purports to document conversations with "thousands of people around the world about their Real friends," featuring Snapchat users discussing their Snap-developed friendships, each represented by a personalized cartoon avatar:



53. Another Snapchat marketing video centers on Snapchat's photo filter feature—one of Snap's most popular and appealing products amongst children and teens:



54. A third Snapchat marketing video opens with animated toy characters entering a photo booth, accompanied by the text, "Happy Snapping! Enjoy the new, faster Snapchat, rebuilt just for Android" followed by a series of playful photo booth images:




55. Snap is widely recognized within the social media industry as a leader in effectively marketing to and engaging minor users. And yet, Snapchat was conceived and designed as a vehicle for sexting and sharing other intimate content. Snapchat's evolution from a platform designed for adult users to one aggressively marketed to children is reflected in its App Store promotional materials. When Snapchat was first released in 2011, its marketing reflected



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

its original intended audience:[26]




56. By 2021 however, Snap's App Store marketing materials reflected its shift toward targeting children and adolescents:




[26] *Snapchat's History: Evolution of Snapchat and Timeline (2026)* (October 19, 2026), https://www.buycustomgeofilters.com/blog/snapchat-history-and-updated-timeline (last visited November 1, 2026).


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

57. Snap's marketing strategy extends to the way it positions itself, or permits itself to be positioned, within third party app stores. On January 17, 2025, for example, Snapchat was featured in the Apple App Store alongside a children's game, such that when iPhone users opened the App Store, Snapchat was the first application they encountered:




58. At all times relevant hereto, and until late 2025 or early 2026, Snap also advertised Snapchat in the Apple App Store and other outlets as safe and appropriate for children "12+ Years Old." Snap made this representation despite its own Terms of Use purporting to prohibit use by children under the age of 13, and in further contravention of the restrictions imposed by the Children's Online Privacy Protection Rule ("COPPA"), 16 CFR Part 312. The more recent revision of Snap's App Store rating from 12+ to 13+ remains materially false and misleading — perpetuating a false sense of security among parents and children that Snap relies on to increase minor user engagement.

**F. <u>Snap Exploits Children's Immaturity to Earn Their Trust</u>**

59. Snap targets school-aged children, designing its products to facilitate access to minors during school hours and to foster the belief that Snapchat is a social necessity.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

60. Snapchat's logo is a cartoonish ghost, and users are represented on the platform via "Bitmoji"—avatars with childlike proportions that allow users to present themselves as a cartoon version of their choosing.




61. Snap created "back to school" messaging designed to convey to adolescents that Snapchat "is the app for students." During the school year, Snap has maintained an explicit goal to "[k]eep Bitmoji top-of-mind among teen-skewing lifestyle media and introduce them the many ways they can use Bitmoji to personalize their back-to-school style."




62. Snap's public-facing representations and marketing strategies were designed to

present Snapchat as a safe, fun and socially essential platform for children and adolescents, cultivating in minor users, like and including the minor plaintiff, the belief that their social lives required active engagement with the platform.

63. By 2016, Snap obtained precise school location data to enable advertisers to geotarget students on campus, boasting to advertisers that "Snapchat reaches 2x as many 13–17-year-olds in the US than Facebook, Instagram, and Messenger – combined." In 2017, Snap's Chief Strategy Officer provided Spiegel with an investor analysis titled, "Snap: A Middle School Crush," which characterized "the middle school set [as] a rabid – almost exclusively – user of Snapchat."

### G. Snap Knowingly Encourages and Facilitates Illegal Use by Children Under 13

64. Snap represented in its Terms of Service and in sworn Congressional testimony, and at all times relevant, that it would not distribute Snapchat to anyone under the age of 13 and that it required parental consent for users under the age of 18.[27] Yet Snap consistently turns a blind eye to underage use of its products.

65. Prior to 2013, Snapchat did not require users to enter their age during registration and by 2015, Snap had lacked age information for approximately 25 million daily active users. When Snapchat introduced a birthday field in its registration flow, that field defaulted to the year 2000, a setting that caused users, including those under the age of 13, to appear to be teenagers regardless of their actual age.

66. Snap modified its registration process in 2017 to default a new user's age to 18—an equally ineffective measure, as any child who failed to input their birthday would automatically appear to be 18. While Snap corrected this issue in other countries, Snapchat in the United States continued to, and at times relevant hereto, default a user age to 18.

67. Snap has never required users to take meaningful steps to verify their age when creating an account. So long as new users input a birthdate identifying themselves as 13 or older—

[27] Snap Inc. *Terms of Service* (eff. Nov. 15, 2021), *available at* https://web.archive.org/web/20220331030647/https://www.snap.com/en-US/terms (last visited November 1, 2026).

or input no date at all and default to 18—they successfully bypass Snapchat's age gate. This frictionless process encourages minor users to misrepresent their age at registration. Snap also designed its sign-on process to allow children who accurately report their age as under 13 to simply reattempt registration without consequence.

68. Snap's process for verifying a user's age at registration is wholly ineffective by design, which ineffective age-verification mechanisms were corroborated by Snap's Senior Director of Product who acknowledged that Snapchat's registration flow produced "scenarios where we're highly confident the inputted age is incorrect." Senior Snap personnel, including Global Head of Platform Safety, Jacqueline Beauchere, acknowledged that children, particularly those under the age of 13, routinely misreport their age at sign-up to gain access to the platform and that when children under the age of 13 do accurately report their age and are denied registration, Snapchat permits them to immediately re-register on the same device using a different birth date.

69. Snap considered prohibiting this practice by implementing mandatory "lock out" periods following a failed age verification attempt but ultimately declined to do so in the interest of user growth and increased revenue. According to Snap's Senior Vice President of Global Policy, Jennifer Stout, such lockout periods "would have a negative impact on daily new users and daily active users," causing a "material impact to user acquisition and growth." Even when Snap knows or has reason to know of underage users on Snapchat, it has made the deliberate decision to take no action to preserve engagement.

70. As early as 2014, Snap boasted that it "absolutely own[s] the youth demo in the US," with approximately 84% of market share among users aged 10 to 24. In advance of Snap's initial public offering three years later, investors observed that middle school children under the age of 13 were "rabid . . . user[s] of Snapchat." In one internal communication, Snap employees stated that Snap does not disclose the number of under-13 accounts it moderates because the number would be "laughable." They further noted that TikTok removes approximately 20 million underage accounts per quarter, while Snap "delete[s] like 50 per day" and deliberately obscures


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

this data point in its Transparency Reports.

71. In December 2021 alone, Snapchat had over 43 million users identified as being under the age of 13. During this same period, Snap removed only 2,430 users—representing 0.00005% of those identified as underage—for accessing the platform before reaching the age of 13. Other documents reveal that Snap disabled escalation protocols for underage users due to high volume. Snap knew that underage children were accessing its product in violation of federal law and took affirmative steps to avoid addressing or otherwise prevent such use.

72. Snap's Head of User Research acknowledged Snap's awareness of children as young as first grade using Snapchat at school. One elementary school teacher reported students creating anonymous Snapchat accounts, "add[ing] a bunch of friends, and then spread[ing] negative or not-appropriate content around the school," which a Snap employee described as "not unlike 'note-passing' at scale without accountability." At a National Student Safety and Security Conference, school resource officers met with Snap's Global Head of Platform Safety and reported that children as young as 9 and 10 years old were sharing child sexual abuse material over Snapchat during third and fourth grade classes.

73. A British report from March 2023 further corroborates Plaintiffs' allegations that Snap deliberately disregards underage and unauthorized use of its platform. In advance of the United Kingdom's Online Safety Bill, TikTok and Snapchat were each asked to report the number of suspected underage accounts removed from their platforms over a one-year period. TikTok reported blocking an average of approximately 180,000 suspected underage accounts per month in the United Kingdom alone—totaling approximately two million accounts over the relevant 12-month period. For that same period, "Snapchat disclosed that it had removed approximately 60 accounts per month, or just over 700 total."[28] A source within Snapchat stated that "It makes no sense that Snapchat is blocking a fraction of the number of children that TikTok is."[29]

---

[28] Martin Coulter, *Exclusive: Snapchat kicks few children off app in Britain, data given to regulator shows*, REUTERS (Mar. 5, 2023), https://www.reuters.com/technology/snapchat-kicks-few-children-off-app-britain-data-given-regulator-shows-2023-03-03/ (last visited November 1, 2026).

[29] *Id.*

74. The explanation is straightforward: enforcing its own Terms of Service with respect to underage users would reduce Snap's user base and, correspondingly, its revenue. Snap's own executives have acknowledged that Snapchat's age verification process "is effectively useless in stopping underage users from signing up to the Snapchat app."[30] However, Snap has failed to warn or disclose this fact to parents, who have no reasonable basis to know that their children can access Snapchat without their knowledge or consent.

75. When selling advertising for profit, Snap calculates is users' actual user age with a high degree of accuracy, irrespective of the age they provide at registration. As early as 2015, Snap had the ability to estimate user age through facial analysis. By 2016, Snap was using age inference technology to restrict age-appropriate advertising, such as alcohol advertisements, to appropriate age cohorts. Snap maintains several age estimation technologies and generates an age estimate for each user account.

76. For example, in January 2018, major alcohol brands withdrew advertising from Snapchat following disclosures calling "into question the adequacy of self-reported age as the sole means of targeting alcohol advertising on Snapchat."[31] To win back these lucrative accounts, Snap made significant investments into its age-inference technologies, such that, by the end of 2018, Snap had stopped relying on self-reported age and, instead, ascertained the actual age of its users with a greater degree of certainty via various collected data points:

> Since then, several alcohol companies – including beer company Heineken, owner of 250 brands, and spirits companies Mast- Jägermeister and Campari Group, maker of 50 brands like Campari, Aperol and SKYY Vodka – are bringing their ad dollars back to Snapchat, citing progress Snapchat has made in guaranteeing their ads won't be shown to minors. The progress has been attributed to Snapchat's move away from age-gating ads purely off of users' self-declared ages and, instead, factoring in things such as how long someone has been on the platform, the age of their closest friends and the type of content they view. If a user declares themselves

---

[30] Isobel Asher Hamilton, *Snapchat admits its age verification safeguards are effectively useless*, BUS. INSIDER (Mar. 19, 2019), https://www.businessinsider.com/snapchat-says-its-age-verification-safeguards-are-effectively-useless-2019-3.

[31] Leonie Roderick, *Diageo pulls ads from Snapchat over age verification concerns*, Marketing Week (Jan. 3, 2018), https://www.marketingweek.com/diageo-pulls-ads-snapchat-audience-safety-concerns/ (last visited November 1, 2026).



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

> as 25, for example, but their closest friends are all 13, that person will no longer be targeted with alcohol ads, according to Frank Amorese, media director at Heineken.[32]

77. Regardless of the age minors such as O.H. input when registering for Snapchat, Snap knows their actual age but take no effort to remove underage users from its platform. Snap uses its determination of minors' actual ages for advertising purposes while failing to apply such actual knowledge for safety purposes. Snap consciously ignores underage use of its platform and continued distributing Snapchat to children it knows to be underage including Plaintiff O.H.

**H. <u>Snap Knowingly Undermines Parental Authority By Facilitating Minors' Downloading of Snapchat Without their Parents' Consent and Providing Broken or Ineffective Parental Controls and Reporting Mechanisms</u>**

78. Until recently, Snap represented in its Terms of Service that parental consent was required for users under the age of 18.[33] Yet in February 2024, in the course of other litigation, Snap acknowledged that "Snap does not verify parental consent to use Snapchat."

79. As alleged in more detail above, Snap's process for verifying user age and identity and confirming parental consent is designed to fail. Snap regularly distributes Snapchat to users it knows to be under the age of 13 and/or under 18 and without parental consent, as it did with O.H. Instead, Snap designs its products in a manner that actively encourages and facilitates minor users' evasion of parental and law enforcement oversight, including through features and practices such as:

a. Disappearing evidence (systems that fail to preserve and/or destroy material evidence on the back end, and not simply the front-end);

b. The "My Eyes Only" encrypted data vault feature;

---

[32] Illyse Liffreing, *Snapchat lures back alcohol brands*, DIGIDAY (Oct. 31, 2018), https://digiday.com/marketing/snapchat-lures-back-alcohol-brands/ (last visited November 1, 2026); *see also* Robert Williams, *Report: Alcohol brands return to Snapchat*, Marketing Dive (Nov. 1, 2018), https://www.marketingdive.com/news/report-alcohol-brands-return-to-snapchat/541119/ (last visited November 1, 2026).

[33] Snap Inc. *Terms of Service* (eff. Nov. 15, 2021), *available at* https://web.archive.org/web/20220331030647/https://www.snap.com/en-US/terms (last visited November 1, 2026).



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

c. The failure to provide parents with information on how to monitor or limit their children's use of Snapchat;

d. The failure to close accounts or restrict access when a user's minor or unauthorized status is known or reasonably should be known to Snap;

e. The failure to notify parents or provide tools for monitoring the amount of time minor users spend on Snapchat, the hours during which they are active, or when they are contacted and/or solicited by adult users;

f. The failure to verify user email addresses or phone numbers;

g. Allowance of multiple accounts, despite claiming that users of such accounts are prohibited; and

h. The failure to enforce its own age restrictions and Terms of Service in any reasonable or meaningful manner.

80. Snap fails to obtain the consent of parents or legal guardians for minors to use the product. In fact, even when a parent reports or otherwise notifies Snap of underage use, Snap engages in a pattern and practice of disregarding and failing to act.

81. While Snap claims that parents bear responsibility for their children's use of Snapchat, Snap simultaneously ensures that parents have no reasonable or practical means to prevent or monitor such use.

82. Even though a substantial portion of Snapchat's user base consisted of users under the age of 18, Snapchat offered no parental control features from its launch in 2011 until August 2022. In August 2022, Snap introduced the "Family Center" feature—a feature that also fails to provide meaningful protection against sex trafficking and abuse of minor users. The Family Center purportedly allows a parent or guardian to link their Snapchat account to their child's account and view a list of the child's contacts. However, the content of the communications—where sexual exploitation most frequently occurs—remains hidden and disappears after the allotted time. The Family Center does not allow parents to restrict a minor user from sending private messages, control their child's access to or engagement with Snapchat's various product



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

features, restrict their child's use of the geolocation feature, or control who their child may add to their friend list. The Family Center is further rendered ineffective where a child has created a Snapchat account without their parents' knowledge, including where Snap knows that the child is below 13.

83. With ineffective age verification systems, no meaningful parental consent mechanisms, and inadequate parental controls, parents are left without any practical tools to monitor or restrict their child's activity on Snapchat and even in cases where they know that such use is occurring. Snap provides minimal information on its website about how Snapchat functions and fails to provide warnings to children and parents regarding the risks of harm children are exposed to on Snapchat. This failure persists despite Snap's extensive marketing activities, including placement in commonly used App Stores (frequently being featured as a recommended app, and placed next to games and similar child-appropriate apps), billboard advertisements, and promotion at high-profile public events like the Super Bowl.

84. The only means by which a child or parent could learn about Snapchat is by downloading it themselves, thereby becoming a contractual user of the product and benefiting Snap as a result. Even then, Snap provides no meaningful information about how the product functions and no warnings regarding the harm its product is known to cause.

85. Snap fails to provide parents and children with an accessible or adequately staffed reporting mechanism to report unauthorized use by minors or the kinds of trafficking harms at issue in this Complaint and further failed to sufficiently disclose or notify consumers of the defective and ineffective reporting mechanisms it implemented during all times relevant.

86. Snap implemented reporting mechanisms that are defective as a matter of general practice and has represented to consumers, including the minor Plaintiff, that functional reporting mechanisms exist and that reports will be acted upon—only to disregard those reports for its own commercial benefit. Parents rely on these representations both specifically, when they try to report violations and egregious harms; but also, they rely on them generally. Parents trust that Snap is not connecting predators to their children by portraying them as "friends." Parents also reasonably



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

believe that Snap is not allowing repeated and serious violations of terms, is acting on reports, and otherwise is reasonably ensuring the safety of its product—as it promises it is in countless ways.

87. A recently filed Attorney General complaint disclosed an internal document in which a Snap employee reported that Snap was permitting accounts to remain active despite having dozens of reports lodged against them, including for the harms at issue here:

> 8. Instead of implementing additional safeguards to address the unique susceptibility of Snapchat, Snap has done the opposite. While recognizing the need to ensure that "user reports related to grooming and sextortion are not continuing to fall through the cracks" and that "no action is taken by agents" in instances where users report "being sextorted or asked for nudes (which we know is often the start of sextortion)," Snap also complained internally that identifying and protecting minors from sexually explicit content and predatory users would overburden its moderators, "create disproportionate admin costs," and should not be its responsibility. Snap employees pointed to a "case where an account had 75 different reports against it since Oct. '21, mentioning nudes, minors, and extortion, yet the account was still active."

## I. Snapchat's "Quick Add" Feature Actively Facilitates Abusive Relationships Between Adult Predators and Vulnerable Kids

88. Snapchat's Quick Add feature selects individuals for users to connect with. A Quick Add request is not generated in response to any user input, but is a communication generated by Snapchat for the purpose of increasing platform engagement. It is not third-party content and cannot be characterized as traditional publishing activity.

89. Quick Add is not necessary for any communicative functions of Snapchat and serves no purpose to product functionality or a user's ability to access content posted by other users. Quick Add does, however, encourage and provide adult users with the ability to identify and contact minor users in a manner that facilitates sexual abuse and exploitation. Snap exploits minors' neuralgic and emotional immaturity to convince them that the individuals selected by



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

Quick Add are non-threatening people they know and share common interests with.

90. Quick Add's effectiveness in deceiving impressionable children to connect with adult strangers results from Snap's written misrepresentations and visual design choices. Snap tells minor users that the individuals selected by Quick Add are "Friends." Snap reinforces these verbal misrepresentations with childlike images of cartoon animals and balloons, to make the Quick Add connection process appear safe and innocent.




Snap further induces minor users to connect with strangers by falsely representing that these selected "Friends" are people "you may know."



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862




91. Miriam Webster's Dictionary defines "friend" as "one that is not hostile."[34] Minor users reasonably understand that by identifying individuals on Quick Add as "Friends" Snap is vouching for those people as not hostile to their well-being. Minor Snapchat users therefore rely on these assurances in accepting Snap's Quick Add selections. Nowhere does Snap suggests that a child should carefully scrutinize proposed "Friends" or that some of the individuals Quick Add selects are sexual predators or other dangerous individuals.[35] Rather**,** Snap facilitates connections between minor users and malign strangers without ever warning of the clear and present danger these strangers pose to their health and safety.

92. Snap pressures minors to connect with Quick Add connections to the point of harassment. For example, when a minor user declines Snap's Quick Add selections, Snap reintroduces the prompt until the user accepts. The following illustrates the type of manipulative imagery Snap directs at minor users who decline to add the "Friends" that Snap selects for them.

---

[34] https://www.merriam-webster.com/dictionary/friend (accessed Sept. 27, 2026).

[35] One commentator estimated that more than 50% of the "random" Quick Add friend requests he accepted immediately sent him explicit photos, tried to get him to sign up for websites selling explicit photos, or otherwise tried to scam him. James McAllister, *Why Random People Are Adding You On Snapchat (And How To Stop It)*, JAMES MCALLISTER ONLINE, *available at* https://web.archive.org/web/20231211180222/https://jamesmcallisteronline.com/random-people-snapchat/ (last visited November 1, 2026)..


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862




93. At times relevant hereto, Snapchat also possessed an "Add 5" button, which prompted users to accept five of Snapchat's Quick Add "Friend" selections at once. A substantial number of minor users utilized the Add 5 feature in reliance on Snap's representations that they knew these strangers and that connecting with them would enhance their Snap Score. The below test account was opened on a new device with no contacts in the phone and no Snapchat connections and yet, after the test user opened a Snapchat account, Snap claimed to have found hundreds of the user's "friends" online. The following are some screenshot examples:




94. Quick Add also manipulates minor users to add "Friends" by exploiting their developmental need for social validation by incorporating social metrics into its product. "Snap Score" is a numerical rating visible to a user's friends of how popular a user is on Snapchat. Minor users are incentivized to add unknown users to increase their Snap Score or Story views.




Videos instructing Snapchat users on how to increase their Snap Scores are popular across Snapchat and all social media. One video on YouTube, for example, has 2 million views. [36]

[36] *How to Increase Snapchat Score! https://www.youtube.com/shorts/kmHUogqcRvQ* (accessed Sept. 27, 2026).


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

95. As designed, Quick Add facilitates connections between adult predators and vulnerable kids. On information and belief, Quick Add's engagement focused algorithms use historic user data obtained through Snap's data collection practices to facilitate connections between vulnerable minors and predatory adults. Because Quick Add's algorithm treats engagement patterns as signals of high user interaction, child predators with a history of connecting with minors receive an increasing number of connection opportunities in the future. Snap rewards predatory adults who successfully forge connections with unsuspecting minors with an expanding roster of child victims to groom and abuse.

96. Snap makes materially false and misleading representations to induce minor users to accept its Quick Add selections. For example, Snap falsely claims that its Quick Add feature does not incorporate location data when generating selections. Numerous users and commentators have reported that Quick Add selections frequently consist of individuals who appear to share no connection with the user other than geographic proximity, suggesting that location is a material factor in how selections are generated. As early as 2019, Snap's own internal research confirmed that Quick Add was recommending strangers to users more than half the time. Snap's own employees acknowledged that they did not understand how Quick Add suggestions were generated and questioned, based on their own experience, whether location data was being used.

97. Snap has incorporated both country and regional location data into its Quick Add feature, substantially increasing the risk of harm to minor users by making them more accessible to nearby predators as a matter of design. But also, Snap allows predators located in one area to claim that they are located someplace entirely different, and so that they can be connected with minor users in that other area.

**J. <u>Snap Expands the Cohort of Minors Available to Adult Predators By Manipulating Kids to Share Contact Information of their Friends and Family</u>**

98. In June 2023, the undersigned law firm opened Snapchat accounts with a new phone. Snap pressured the test user, who had self-identified as a sixteen-year-old child, into providing access to her contacts through dark patterns, or manipulative messaging and interface



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

designs intended to induce users to push buttons, provide access, and otherwise take actions they would not otherwise take.

99. The initial screen instructed the user to "Tap 'Allow' when prompted," while a subsequent screen displays a faded background message suggesting that enabling app permissions would simplify the sign-up process.




100. Snapchat next asked for the minor user to grant access to the names, addresses phone numbers and emails of every contact stored on her cell phone.




101. When the test user declined to grant contact access, Snap sent a second tantalizing


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

message telling the minor user that "Your friends are waiting for you!" and exhorting her to allow Snapchat access to her contacts. This request was surrounded with child-like imagery to make Snap's request for the contact information of her friends and family appear harmless and integral to the Snapchat experience.




When the user refused to grant access to her contacts for a second time, Snap sent a third request suggesting that granting such access would expedite the sign up process.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862




102. Snap knows that minor users are particularly susceptible to this form of manipulation yet repeatedly pressures them to share contacts and personal information against their wishes. And countless children are being tricked, then harmed, as a direct result.

## K. Snap's Bitmoji Feature Creates Content That Materially Contributes to Child Sexual Abuse

103. Immediately after creating a Snapchat account, users are prompted to create a Bitmoji, an avatar that serves as their profile picture on Snapchat. Snapchat then uses the image provided by the user to generate cartoon-like renditions from which the user can choose to serve as their avatar.




104. To illustrate this process, undersigned law firm created a new Snapchat account and, when prompted to take a picture of themselves, used a stock image retrieved through a google search of "14-year-old girl."




105. Every Snapchat user's Bitmoji is created by Snapchat and is limited by the tools, options, and processes Snap has designed and made available. In many instances Snap generates the avatar itself with little to no user input.

106. Bitmojis promote a sense of playfulness and engender trust. Nobel Prize-winning ethnologist Konrad Lorenz identified *Kindchenschema*—baby schema—describing the features


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

that characterize an infant's face: a protruding forehead, a large head, a round face, big eyes, and a small nose or mouth.[37] These features, when integrated, make a child's face appear to be cute, attractive, and lovable. Lorenz theorized that these features trigger an innate caregiver response in humans. Subsequent research has confirmed that baby schema influences appeal of both infants' and children's faces because facial cranial growth is gradual during early childhood and certain crucial infantile facial cues remain readily available during this period**.**[38]

107. Over the past decade, *Kindchenschema* has had a significant impact on online communication. A 2024 study by Japanese and Israeli researchers found that avatars featuring baby schema features received higher ratings, were perceived as more "cute," "likable," "approachable," "pleasant," and elicited more positive emotions than neutral mature avatar designs.[39]

108. Snap has deliberately exploited *Kindchenschema* in its design, creation, and implementation of Snapchat Bitmojis. Bitmojis are stylistically cherubic, their enlarged eyes, small body and cartoon design foster a child-like innocence that can be misleading. This design has the practical effect of presenting adult users, including predatory users, as benign and non-threatening to the minor users who encounter them on Snapchat.

109. To illustrate this effect, the following examples were generated by running publicly available photographs of notoriously convicted criminals through Snapchat's Bitmoji product. The resulting avatars, created entirely by Snap, render each individual as a cartoonish, innocuous-appearing figure.

---

[37] Konrad Lorenz, *Die angeborenen Formen möglicher Erfahrung (The innate forms of experience)*, 5 Zeitschrift für Tierpsychologie, 235–409 K. (1943).

[38] Li Zhu Luo, Hong Li, Kang Lee *Are children's faces really more appealing than those of adults? Testing the baby schema hypothesis beyond infancy*, J EXP CHILD PSYCHOL. 110 (Sept. 2011).

[39] Shiri Lieber-Milo, Yair Amichai-Hamburger1, Tomoko Yonezawa, Kazunori Sugiura Cuteness in avatar design: a cross-cultural study on the influence of baby schema features and other visual characteristics AI & SOC. (2024).



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862




**Harvey Weinstein** **R. Kelly**

**Jeffrey Dahmer** **Charles Manson**

110. Research analyzing the online communications of convicted sexual offenders confirms that the use of emoji and emoticons is a common feature of grooming behavior and is employed obscure their malign intent.[40] A scholarly review of criminal cases across diverse jurisdictions found that emojis are increasingly recognized as a facilitator or adjunct to unlawful sexual solicitation through online platforms.[41] And Snapchat's Bitmojis perform precisely this role.

111. By exploiting the emotive and trust-generating properties of *Kindchenschema,* Snap's Bitmojis facilitate children's misplaced trust in unknown adults.

112. The central perceived attributes of Bitmojis—their cuteness and playfulness—makes them a particularly effective grooming tool used by predators seeking to sexually exploit minors. The anonymity inherent in Snapchat's design, combined with cartoon avatars that project innocence, can readily mask predatory intent. While Bitmojis make digital communications

---

[40] April Kontostathis, et al., *Chat Coder: Toward the Tracking and Categorization of Internet Predators* (2019), https://www.researchgate.net/publication/241604515_ChatCoder_Toward_the_Tracking_and_Categorization_of_Internet_Predators.

[41] Marilyn McMahon & Elizabeth Kirley, *When Cute Becomes Criminal: Emoji, Threats and Online Grooming*, 21 MINN. J. L. SCI. & TECH. 37 (2019)

appear warm and inviting, this design serves a function that, in the hands of bad actors, facilitates harm to children.

113. Snap's Bitmoji product is one example of Snap's role as an information-content provider under 47 U.S.C. § 230(f)(3). Snapchat's own Terms of Use specify that "Snap is the owner of the Services, which includes all related brands, works of authorship, Bitmoji avatars that you assemble, software, and other proprietary content, features, and technology."[42]

## L. <u>Snap Has Known for Over a Decade that Snapchat Facilitates Child Sexual Abuse But Refuses to Warn Minor Users and their Parents of this Clear and Present Danger</u>

114. In 2021, a Snap employee expressed concern that the company was not escalating content clearly involving underage kids. "The examples I checked in the sheet are pretty clear-cut cases that should be escalated to T&S for review/action … I noticed that our UGC Broadcast policy doc does not indicate that these need to be escalated, is there a reason for the confusion?"

> On Wed, Oct 20, 2021 at 8:40 AM 'Jose Cipitria' via Discover Moderation <discover-moderation@snapchat.com> wrote:
>
> +full team for viz
>
> Many thanks for sharing, Tirelle! The examples I checked in the sheet are pretty clear-cut cases that should be escalated to T&S for review/action, they are already being rejected by our vendor team per policy (I pasted the policy below for reference).
>
> I noticed that our UGC Broadcast policy doc does not indicate that these need to be escalated, is that the reason for the confusion? We can ask Evan G to update and update the vendor team accordingly with examples. Happy to help with collecting good examples. Once we agree on next steps, we should give T&S a heads up (Ayesa, Selena and Juliet).
>
> - ✗ *Self-recorded minors under 13 with no adult present (NOTE: When in doubt about the age of the person depicted, always proceed conservatively)*
>   - ***Clear "selfie" content with individuals that seem to be below 13 (including the content where the minor is approaching the camera to turn it on/off)***
>   - ***The camera is fully stationary (i.e. not moving at all), and the only person depicted seems to be under 13***

115. Snap executives confirmed that this was a deliberate choice, more specifically, because "this would be a ton of content" and "will result in a large amount of escalations." "Correct, T&S would not be able to take this on right now."

[42] Snap Terms of Service, SNAP INC., https://snap.com/en-US/terms (last visited November 1, 2026).



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

**From:** Evan Geary [evan.geary@snap.com]
**Sent:** 10/20/2021 12:02:36 PM
**To:** Aaron Altschuler [aaltschuler@snap.com]
**CC:** Althea Tupper [althea@snap.com]; Bryan Schilling [bschilling@snap.com]; Discover Moderation [discover-moderation@snapchat.com]; Jose Cipitria [jcipitria@snap.com]; Juliet Shen [jshen@snap.com]; Tara Weseloh [tara.weseloh@snap.com]; Tirelle Barron [tbarron@snapchat.com]
**Subject:** Re: Spotlight Snaps that are likely to come from a minor's account

I don't think there's a strong policy case to route these to T&S, but thanks for raising.

On Wed, Oct 20, 2021 at 11:53 AM Aaron Altschuler <aaltschuler@snap.com> wrote:
Thanks Althea. Correct, T&S would not be able to take this on right now.

On Wed, Oct 20, 2021 at 11:35 AM Althea Tupper <althea@snap.com> wrote:
+1 agree. I don't think we can make this change now due to the T&S bandwidth and this would be a ton of content. We can agree on a date and change if it makes sense and we agree with T&S.

Including @Aaron Altschuler @Bryan Schilling for visibility.

Althea Tupper
Core Eng, Ops and Integrity | Review Operations
Snap: altheatupper | Mobile: (917) 714-0450

On Wed, Oct 20, 2021 at 11:30 AM Tara Weseloh <tara.weseloh@snap.com> wrote:
+ @Evan Geary for vis if we want to make this an escalation in the UGC Broadcast doc. This will result in a large amount of escalations - I think we should try to get a rough idea of how many we are currently rejecting before implementing so we can make sure to not flood the T&S queues. I'll coordinate with the vendor teams and follow up here!

116. Snap continued to obtain such knowledge of how it was facilitating sexual abuse related harms in 2022 through letters from parents whose children were sextorted on Snapchat in similar ways as O.H. and communications with law enforcement and the National Center for Missing and Exploited Children.

117. Snap was aware of how big of a problem sextortion had become in its digital place of business yet continued to advertise Snapchat as safe for kids. It did not disable Quick Add for minor users, re-program the feature to avoid systems connecting predators to children, or warn people about the terrible harms happening as a result of this one product feature.

118. In 2023, Snap learned of a test in which an employee of the undersigned law firm opened a Snapchat account with a new phone posing as a sixteen-year-old girl. Almost all the "friends" Quick Add selected for her turned out to be predatory adults.

119. As a result of simply accepting the "Friends" Snap selected Snap pushed the test account of a self-identified minor into a sex trading filter bubble in a matter of just a few, passive log on sessions. That is how Snap designs its Snapchat product.

120. Then, in 2024 at the latest, Snap received a document entitled "The Sextortion Handbook: A Comprehensive Guide for Predators." As described below, this horrific manuscript provides child sex predators with step-by-step instructions on how to implement their malign intent.

Sextortion Handbook: A Comprehensive Guide For Perpetrator [FIRST EDITION]
Sextortion. Done right. (3 hrs 48 mins read.)

PROLOGUE

The Sextortion Handbook is a comprehensive guide that provides deep insights into the tactics and strategies that can be used to manipulate and exploit victims, primarily through the use of compromising photos or videos. It delves into aspects of coercion and highlights the various methods to maintain control, instill fear, and coerce victims into complying with the perpetrator's demands. Additionally, it offers step-by-step instructions for everything there is to know about carrying out a successful sextortion scheme, from identifying potential targets to executing the blackmail process to creating convincing fake identities, maintaining anonymity online, monetizing, and safely storing sextortion content, ensuring that the perpetrator remains untraceable.

This is not a handbook to teach victims how to protect themselves or seek help, but rather to teach perpetrators how to exploit their victims.

121. The Sextortion Handbook identifies Snapchat as "the best app for sextortion" based on its unique product features. As depicted in the three screenshot examples below, the Sextortion Handbook instructs predators how to use Snapchat's Quick Add feature and Snap's engagement-first programming choices to connect with large numbers of potential child victims.

II. Quick Add

The Quick Add feature on Snapchat is designed to help users discover and add new friends. It takes into account factors such as mutual friends, contacts in the user's phone, and users who are in close proximity to each other.

Quick Add Step-by-Step Guide

Step 1. Select your desired location for Quick Add:

Geographic location is a significant factor in Quick Add, especially if you are seeking targets who send sexually explicit photos. In the event that your Quick Add proximity is situated in the incorrect geographic location, it could significantly reduce the chances of finding individuals who share sexually explicit photos. This could potentially result in a very low success rate or even make it impossible to locate such targets. If, on the other hand , your Quick Add proximity is situated in the appropriate geographic location, you may have a very high chance of successfully locating targets who send sexually explicit photos.

Date Of Birth:

When creating your Snapchat account, it is important to input a birthdate between the ages of 13 and 17. If you set your birthdate as 18 or older, it will negatively impact your experience on the platform, as you will not find teenagers below 18, who are the most likely to be sextortion victims, and instead come across random fake bot accounts in the quick add section. Teenagers are the main users of Snapchat. Blackmailing an adult on Snapchat is more challenging.

In order to maximize your visibility on Snapchat's quickadd feature, it is advisable to set your age to 15 years old. This particular age is considered the median age, which means that it falls right in the middle of the age range for Snapchat users. By selecting this age, Snapchat will ensure that your profile is visible to all teenagers aged 13 to 17.

122. The Handbook also tutors pedophiles on how to target large groups of kids in a single location by using Snap Map to visit a school location. According to this terrible, third-party source, once a predator finds a school on the Snap Map, he can tap on the screen to view any Snap Stories that might have been shared by students with the "Snap Maps" option enabled.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

> Step 2. Find and add individuals who live in your desired location:
> Once you have selected your desired location, it's time to find individuals
> who live
> in your desired location. First, choose a city in your desired state or country; after
> that,
> find a middle school or high school in that city. Once you have successfully found a
> school,
> there are two ways to find individuals from the school of your choice.
>
> The first is to visit the Instagram profile that is associated with the
> school. Every
> school in the United States of America has at least one Instagram profile, if not an
> official
> one. After you have found the Instagram page for the school, click on the "Followers"
> tab and
> look for students following that school's Instagram account. Once you have found the
> students,
> enter their profile, check whether they have their Snapchat username included in their
> Instagram bio, and then add those users on Snapchat.
>
> The second is to visit the location of the school using Snapchat Maps. You can
> do this
> by searching for the school's name on Snapchat. Once the school appears on Snapchat
> Maps,
> navigate to the premises of the school and tap on the screen to view any snap stories
> that
> might have been shared by students who share snap stories with the "Snap Maps" option
> enabled.

123. The Sextortion Handbook also instructs child sex predators how to create a benign facial image that is attractive to potential victims.

124. Though Snap knew about these risks prior to its receipt of the Sextortion Handbook, in the almost three years since Snap executives were notified of this evil document, they have refused to disable Quick Add for minor users, remove location and/or similar, dangerous factors from its programming, disable its Snap Map location feature, verify phone numbers at sign up, stop using location in Quick Add recommendations, stop allowing users to open multiple accounts and to lie about age and location, or even warn consumers and parents about the risks of its platform.

125. Snap knew about the Sextortion Handbook and knew about how predators were using its specific tools and programming choices to abuse thousands of children via its product and digital place of business. Yet Snap maintained its 12+ age rating and continued to cause these terrible harms by design.

### M. Snapchat Facilitates Child Sexual Abuse Through its Direct Messaging, Disappearing Messaging, and Snap Map Features

126. Snapchat's direct messaging features provide anonymous and semi-anonymous adult users, bullies, and other strangers to whom a parent would not allow access, with unrestricted and unsupervised access to minor users. Snapchat's direct messaging features are inherently dangerous and defective when utilized in connection with minor users.

127. Minor users lack the cognitive development and life experience to identify online grooming behavior and the psychosocial maturity to decline invitations to exchange salacious material. Snapchat's product features allow direct messaging with and by minor users without parental notification.

128. Snap could have reasonably restricted these product features so that minor users were unable to use them or could only receive such messages from persons approved by the minor's parent or guardian.

129. Snapchat's direct and disappearing messaging features (disappearing on the back end specifically as compared to the front end) are not necessary and serve no critical function to product functionality. These features are, however, highly profitable in terms of engagement and retention, both among minor and adult users.

130. Snap could also have reasonably programmed Snapchat, as many of its competitors and virtually every company in every other industry does, to not delete material evidence and data relating to minor users on the back end. Upon information and belief, even after law enforcement issues subpoenas and preservation requests to Snap for records relating to a specific predator, Snap allows the predator to keep using Snapchat and to do so without implementing the necessary programming or product changes to ensure preservation of ongoing communications.

131. Likewise, even when Snap reviews reports of violations, it often deletes such violating content—including evidence of illegal activities—without even reporting such illegal activities to law enforcement or taking down the offending account. This allegation is not about


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

imposing any sort of moderation obligation on Snap. It is about what Snap knows and then does after having actual knowledge of violations and even harms to children like the ones at issue in this Complaint. It is about Snap failing to warn, while allowing illegal activities to occur in its digital place of business and then going so far as to recommend and make representations in support of children connecting with these predators, while effectively covering up the crimes occurring with and because of the tools Snap provides.

132. Snap possesses the technical capability to implement preservation measures in all regards and has chosen not to do so. On information and belief, one of the reasons Snap has failed and refuses to prioritize safety by design is because it would effectively undermine what Snap understands to be a primary selling point for millions of its users: the ability to send Snaps and otherwise engage in a manner that ensures there is no record of what transpires.

133. In addition to connecting predators with minor users and actively convincing those minors that predatory strangers are their "friends" and that they should connect with them in private, Snap has implemented product designs that actively assist predatory users in locating children in real life. Snapchat provides a feature called Snap Map, which allows users to share their real-time location on an interactive map with followers, and in the case of content submitted by the users, to the public.

134. At all times relevant hereto, Snap made this feature available to all users, including minors. Snap further made this product as attractive to children as possible. For example, it will display a user's Bitmoji in a car when the user is moving at or above a certain speed. Children understand that this is a game and will compete by running as fast as they can to try and get Snap to display their Bitmoji in a car. Snap has purposefully removed all appearance of danger from what is effectively Snap sharing the real time location information of minor children (and, in turn, their parents and friends) with predatory strangers.

135. Snap does not even offer children with the ability to use this gamified feature without actually sharing their location information; and/or, if it does, it does not explain this or provide minor users with the information they need to protect themselves. Instead, Snap


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

convinces children to use the Snap Map (and because it's good for Snap's engagement), and without any warning of the terrible dangers, which are not apparent to minor users.

136. The Snap Map product feature has directly contributed to stalking and physical harm to minor users—harms of which Snap has knowledge. On information and belief, Snap even, at one point, considered certain safety features. For example, Snap could limit the features' ability to show any location other than public places of business. But once again, Snap opted for engagement over the safety of its youngest users.

**N. Recent Testing Independently Confirms Snapchat's Imminent Threat to Child Health and Safety**

137. Several recent reports confirm that Snapchat is dangerous by design and is designed and operated to work precisely how Plaintiffs allege.

138. In 2026, Heat Initiative and Parents Together published an executive summary titled, *Everybody Got Demons, I use Drugs to Quiet Mine: One Week on Snapchat as a 7th Grader*. Researchers used Snapchat for several hours on accounts registered to 13-year-olds to see what sort of content and connections Snap recommended. Snap "recommended 419 strangers as friends to two accounts registered to 13-year-old users … most of whom were likely adults with an average estimated age of 24"; "Snap's initial friend selections to new teen accounts included at least six sexual content creators …"; a "13-year-old avatar … received two friend request from strangers, both of whom appeared to be adult men" (and despite Snap claiming that younger teens no longer had access to Public Profiles); Snap allowed teen accounts to "share their live, precise location to all friends without parental approval …"; and more. A copy of *Everybody Got Demons, I use Drugs to Quiet Mine: One Week on Snapchat as a 7th Grader* is attached to this Complaint as **Exhibit A**.

139. Also in 2026, Parents Together Action, Heat Initiative, Design It For Us, and The Anxious Generation published a quantitative methodology and research design report titled, *The Hidden Dangers of Snapchat for Kids: Experiences of Snapchat Users Ages 10-17*. This report presents findings from a 12-minute national quantitative study conducted among 1,016 minors


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

aged 10-17 who used Snapchat within the past 6 months. The data was collected from December 4th to December 19th, 2025 and the findings from this study confirmed that, despite Snap's representations of having made its product safer, Snapchat remains far from safe—minors still face alarmingly high rates of exposure to harms on a regular basis while using the Snapchat platform. A copy of *The Hidden Dangers of Snapchat for Kids: Experiences of Snapchat Users Ages 10-17* is attached to this Complaint as **Exhibit B**.

140. And, again, in 2026, Heat Initiative and Cybersafety Research Center published a report titled, *Broken, Buried, or Missing: Anatomies of Failure (and Success) of Social Media Child Safety Features*. This report does not focus solely on Snap, however, its findings as to Snapchat confirmed that even the safety features Snap claimed to have implemented (after plaintiffs began holding it accountable in courts of law) did not work as described. "The combination of inaccessible placement and unreliable implementation makes this a consequential failure in the scope of child safety." A copy of *Broken, Buried, or Missing: Anatomies of Failure (and Success) of Social Media Child Safety Features* is attached to this Complaint as **Exhibit C**.

**O. Plaintiffs Do Not Seek to Hold Snap Liable as a Publisher But Rather For its Violation of State and Federal Laws Protecting Children From Sexual Abuse and Design and Marketing of Unreasonably Dangerous Social Media Products**

141. Plaintiffs' claims arise from Snap's status as the designer, marketer, distributor, and operator of dangerously defective social media products, as well as from Snap's own affirmative statements and actions.

142. The structure of Snap's social media products and technologies are, standing alone, harmful to users irrespective of third-party content.

143. Snap programs its platforms to exploit the vulnerabilities of minors to influence user behavior. The neurological development of adolescent users renders them especially susceptible to such techniques.

144. Snap has further designed product features that actively encourage and assist minor users in evading parental oversight, protection, and consent—features that are wholly unnecessary to the functionality of the platform.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

145. Snap is responsible for the harms described herein, which are the direct result of Snap's deliberate design choices and business decisions.

146. None of Plaintiffs' claims for relief set forth herein treat Snap as a speaker or publisher of content posted by third parties. Plaintiffs seek to hold Snap liable for its own affirmative content and creations and its own failure to warn users and parents of the foreseeable dangers (dangers foreseeable to Snap only) arising from the anticipated use of its products. Snap marketed those products as safe while purposefully concealing the actual harms its products were causing harms that were far more nefarious and catastrophic than any consumer or parent had reason to suspect.

147. Snap could have fulfilled its legal duty to design reasonably safe social media products and to provide adequate warnings of foreseeable dangers to users a without altering, removing, or otherwise affecting third-party content or user accounts.

148. Snap is also liable for creating content that materially contributed to the unlawful conduct set forth herein. Snap is responsible for the creation and development of a substantial portion of the content displayed on Snapchat, including but not limited to its Bitmoji feature. By virtue of that, Snapchat is not exclusively an "interactive computer service." Snap is wholly or partly responsible for the creation or development of content on Snapchat—including the content that materially contributed to the harms at issue herein—and is therefore, and to the extent of those contributions, "an information content provider" under 47 U.S.C. § 230(f)(3).

## P. Snap and Walter Effectuated the Sexual Exploitation of O.H through Their Concerted Action

149. O.H. got her first phone when middle school began, at age 11 or 12. O.H. needed to ride the bus to school, and her mother, S.H., wanted a way to reach her.

150. S.H. counselled O.H. about responsible phone use.

151. S.H. told O.H. that she could watch YouTube. YouTube appeared to S.H. to be a streaming app, used by kids and even schools to gain access to resources and videos. But S.H. did not know enough about other social media products to be comfortable with them and did not want


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

her child connecting online with people she did not know in real life.

152. S.H. told O.H. that other social media apps were not allowed. S.H. had no reason to think that companies like Snap were designing and distributing their apps in a manner that encouraged and allowed access by underage children without parental knowledge or consent.

153. S.H. checked O.H.'s phone regularly, as a precaution and so that she would know what O.H. was doing on the device. S.H. never saw Snapchat on O.H.'s device and had no reason to know or even suspect that Snap was allowing underage children to download and delete its app literally hundreds of times.

154. Many children whose parents forbid their access to Snapchat will start downloading the app every day as they leave for school, then remove it on their way home. Some even repeat this pattern at night, after their parent has gone to bed. It makes Snapchat undetectable on a device, though sends a clear signal to Snap itself (and/or the app stores that are providing the app multiple times each day) that the user is both almost certainly a child (due to the school hours pattern) and is hiding their use of the product.

155. Snap permits underage children like O.H. to open Snapchat accounts repeatedly without any reasonable form of age verification. On the contrary, and at all times relevant, the workflow defaulted and/or made sure that kids knew what age they needed to enter, and/or did not stop them from trying again if they input too young of an age the first time around.

156. Twelve-year-old O.H. began downloading Snapchat when she left her house each day, using the app during school hours, then deleting it on her way home. Then she realized she could do the same thing at night, and virtually every time she left the house and her parents were not with her. This was not something O.H.'s mother expected or even knew was a possibility.

157. Snap convinced O.H. that Snapchat was harmless and safe. When O.H. starting using Snapchat, she thought that it was fun and safe, and made for kids. O.H. wanted it for the funny and cool filters and because it felt like all of her friends used Snapchat, and that she would be left out if she did not.

158. O.H. knew that her mom said no to Snapchat, but didn't understand why—



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

especially because Snapchat, she thought, was made for kids. Snapchat had cool filters, fun cartoons, and built-in games. For example, each time O.H. sent and received messages, she would get points on her Snap Score, which is the visible score by her name that everyone wanted to get as high as possible. O.H. could see her Score go up when she did stuff, and it felt good.

159. Snapchat did not permit O.H. to use a picture of herself for her profile like other apps. Instead, Snapchat pushed her through the process of creating a Bitmoji, a cartoon avatar that O.H. could dress up however she wanted. Bitmojis were another aspect of Snapchat that O.H. and her friends loved. Bitmojis made everyone look like middle school kids, and O.H. and her friends generally assumed that only kids, like them, would be using Snapchat because of these cartoon and game features.

160. Once O.H. began using Snapchat, Snap began connecting other users to O.H. through its Quick Add feature. Snap vouched for these users as "Friends" and told O.H. that these were individuals she knew or would want to know. Snap's "Friend" selections looked harmless because Snap designed them to look that way. O.H. had no reason to think that the people Snap was telling her to add as "Friends" were dangerous and adding them felt like fun.

161. After O.H. began using Snapchat—without parental knowledge or consent—she went from being happy and outgoing, to someone who was tired and anxious. O.H. had never struggled with rules in the past, and suddenly she found herself breaking those rules for something that felt like a social imperative. And, in the fall of 2023, things got worse.

162. In the fall of 2023, Snap initiated a connection to and urged O.H. to accept an 18-year-old named Walter as a Snapchat "Friend." O.H. and Walter did not know each other in real life and lived thousands of miles apart. But despite the lack of any real-life friendship, Snapchat connected Walter to a 12-year-old minor, O.H.

163. Through its Bitmoji feature, Snap created content through which Walter appeared as a young, wide-eyed, innocent, and friendly looking child and facilitated his transmission of this deceptive image to hundreds of unsuspecting minor users, including O.H. Snap's Bitmoji feature materially contributed O.H.'s sexual exploitation by creating an image of Walter that



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

incorporated *Kindchenschema* to make him appear safe and non-threatening. If Walter had not been able to conceal his true image through Snap's Bitmoji feature, he would not have been able to gain O.H.'s trust and implement his malign purpose.

164. At all times material hereto, Snap had actual knowledge of Walter's true age and gender. Snap utilizes sophisticated technologies to ascertain the actual ages and genders of its users and uses this actual knowledge for marketing and product development purposes.

165. Snap knew that O.H. was a minor, no matter the age she claimed to be at account sign up. And Snap knew that Walter was an adult male, no matter how he represented himself on Snapchat. Yet, while knowing that Walter was misrepresenting his gender and age and actively targeting minor girls throughout the United States, Snap furnished him the tools he used to identify, connect with, groom, and abuse O.H.

166. Snap did not provide O.H. with any way to filter, blur, or block explicit content. She did not know that this was a risk when her Snapchat use began, and was confused when it happened, including because she was just a child and did not understand what Snap was doing.

167. After Snap recommended and convinced O.H. to connect with Walter, it also then provided Walter with O.H.'s home address via its Snap Map feature. O.H. did not realize that the people Snap connected her with via Quick Add could find out exactly where she was at any given time. O.H. did not realize that she was in such danger and would never have said yes to strangers being given her home and school addresses.

168. Walter used Snap Map to geolocate O.H., even though he lived on the other side of the country. When O.H. refused to exchange explicit photos, Walter sent her a Snap with her home address. Walter told O.H. that he knew where she lived and that if she did not do as he said then he would come to her home and rape her and kill her mother.

169. Spokane County Sheriff records indicate that Snapchat and its design and features were integral to Walter's abuse of O.H.:



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

*[redacted] is a thirteen-year-old female.*

*[redacted] was twelve years old at the time of the incident.*

*[redacted] said she was there to talk about online sexual abuse. When the incident occurred, she was in the bathroom at her mom's house. The suspect quick added her on Snap Chat. They had been talking only a few minutes and he started to ask her for photos. He then asked her for nudes, and she told him no. She explained he used scary words that she did not like, and told her to do it now. He then sent her own address to her and told her if she didn't send them, he would come to her house and rape her (she did not know how he got her address). She thought he may have also threatened to kill her mom, but she could not remember for sure. She then sent him nudes because she did not want her or her mom to get hurt. He told her he lived twenty minutes away. She was horrified, petrified, and shaking the whole time. She was afraid to tell her mom because she was not supposed to have Snap Chat. She was home alone at the time. She turned all the lights in the house off and locked herself in the bathroom.*

*She thinks after she sent the photo he called her a good girl. She told him she was going to block him, and he asked her for just one more nude. She did send another nude and then blocked him.*

*[redacted] used her phone to talk with the male on Snap Chat. She no longer had the phone*

170. One example obtained by police shows Walter forcing O.H. to do things to herself and to show him via Snapchat. "Chop chop," he writes. O.H. responds, "I'm scared … I will call the cops." Walter says, "I can ruin your life I don't think you have a choice."

171. S.H. was unaware at the time of Walter's abuse of O.H. through Snapchat.

172. After the abuse started, O.H. ultimately got up the courage to block Walter. She was terrified he would find her and make good on his threats, and she began to want as far away from Snapchat as possible.

173. While it was difficult, and while O.H. worried that she would be left out at school and among her friend group for not having Snapchat, O.H. eventually stopped using Snapchat. O.H. began to get more sleep and was no longer having to lie to her family to keep using Snapchat. But O.H. was still terrified because she knew that Walter knew where she lived. O.H. would break down in the middle of the day, in tears at school and unable to function. She feared that Walter would come for her and was embarrassed and ashamed.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

174. In late 2023, the parent of a girl in Connecticut who Walter was sextorting discovered explicit images on her daughter's device and reported it to law enforcement, who located Walter in Louisiana. Police executed a search of Walter's devices and found O.H.'s photos and five videos obtained through Snapchat. Those photos and significant work by Louisiana investigators eventually led them to O.H. and her mother.

175. In April 2024, S.H. was greeted by law enforcement at her door and learned what had happened to her child who, up until then, S.H. reasonably believed to be Snapchat-free.

176. S.H. rushed to O.H.'s school in tears, and O.H. finally was able to tell someone about Snapchat and Walter. They spoke with police and sought immediate help for O.H.

177. Walter's coercive use of Snap Map to threaten O.H. was replicated on numerous other victims throughout the United States. According to police records, Walter told the 13-year-old from Connecticut that eventually reported him to law enforcement that he had her address, and he threatened to rape her.

During the return the following conversations were located:
Example 1:
[redacted]"-Nunnn
| Glenn-waaaa
[redacted]"-ðŸ˜ðŸ˜
| **Glenn-and come rape u**
| **Glenn-got ur addy imma pull up**
[redacted]"-brooooooo
| Glenn-baeeeee
| Glenn-make me

178. He told a second 13-year-old on Snapchat from Connecticut that he had raped a 10-year-old and planned to rape her too. He wrote, "I've done it before and I'll do it again."



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

| Glenn-Your gonna be my 7th
| Glenn-Yea..
| "[redacted]"-Are you being serious
| Glenn-Felt so ducking good
| "[redacted]"-What.
| Glenn-She was 10
| "[redacted]"-Bro what
| Glenn-Iâ€™ve done it before Iâ€™ll do it agian
| "[redacted]"-Cuz you wonâ€™t rape me ðŸ¤-â€. â™€ï,
| Glenn-Oh yea
| "[redacted]"-Uhm no

179. In April 2024, Glenn Walter told yet another underage Snapchat user that he had her address and would "see you in a few."

April 08, 2024

Glenn-Idc wtf you say Iâ€™m seeing you Tn
Glenn-Wait nvm I got a as of your addy
Glenn-And idgaf Iâ€™ll dead ass throw a rock at your window and come into that bitch
Glenn-Iâ€™ll see you in a few
Glenn-And we fucking idc
[redacted]-No
[redacted]-Were not
Glenn-Iâ€™ll do wtv to fuck you idc if you say no
[redacted]-you're a pyhsco
Glenn-I sure the fuck am

180. While police found numerous explicit images of underage teens and tweens on Walter's device, they were limited in time due to Snap's auto deletion feature. Because of Snapchat's design choices, it was impossible for police to find and help some victims, and finding the evidence they did for O.H. often is the exception and not the rule. Snap does this by design.

181. Snap knows when predators like Walter are using its product. And even in instances when it purports to stop them by taking down their account, Snap has simply let them create a new one on the same device and continue their abuse. In April 2024, for example, Walter messaged someone via Facebook, "My snap got banned." Then he messaged immediately after, "I made a new one."

182. At all times relevant, Snap had the ability to block predatory users at the device level. In fact, and notably, Snap frequently freezes the accounts of young Snapchatters that file



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

lawsuits against Snap and then blocks them at the device level so that they cannot open new accounts without purchasing a new device.

183. Even then, Snap often is able to connect new accounts on a different device via things like emails, personal information provided, friend lists, and/or similar, to then block those new accounts. And yet, while Snap affirmatively, and thoroughly, acts to block the accounts of children who file a lawsuit against Snap, during all relevant times, Snap routinely did not block by device the sexual predators it knew about and purported to act upon by taking down their accounts.

**Q. Defendants' Illegal Conduct Caused Continuing Harms to O.H.**

184. O.H. had no prior, reported history of trauma. She now requires ongoing mental health services and sleep medication as the result of the harms that Snap and Walter caused.

> *per client: "In November 2023, I met a guy on Snapchat. He was 18. He kept asking for naked photos but I kept refusing. He said he had my address. He sent me my address. He said he lived 20 minutes away. He said if I didn't send him the photos he would come here and rape me and kill my mother. It was just one time. I provided him the photos and then I blocked him. I knew he would want something more. Something else. I deleted Snapchat. Two detectives showed up on my doorstep about a month ago. The guy lives in Louisiana and the detectives there contacted Spokane PD. I was one of 13 victims [kids]. The Spokane Detectives talked to my mom. The guy is in custody and they said he could get 50 years in prison. He raped a girl in Louisiana. I may have to testify but I don't know yet. My mom showed me a picture of him and my heart just dropped."*

185. O.H. struggles and while she is working hard to make things less difficult, even years after the event, she thinks of it often. These harms interfere with her education and her ability to function, to connect with others, and to trust that anything will ever be okay.

> ***Client reports struggling with her grades following the sex trafficking incident ["that's all I can think about"].***

186. O.H. will struggle with such harms for the rest of her life and, at all times relevant, Snap knew that it was causing and contributing to such harms as a matter of design.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

> *per client: " Anxious. I can't focus in class. I have a hard time sleeping and then when I do sleep, I oversleep. I feel nervous to talk to people. I feel all tingly inside. My body freezes. I feel like I'm paralyzed, like I can't move. I fiddle with my hair, nails, or whatever I have. I get flashbacks about what happened- I feel like I can't move or think about anything except that memory. I try to stop but it's really hard for me to stop. At least once or twice a day. I get headaches. Racing thoughts or mind goes blank. "*

187. O.H.'s mother, S.H., has since spent sleepless nights replaying every possible, terrible scenario in her mind. S.H. is an engaged parent who did everything right. And still, Snap found a way to bypass her parental rights and safety measures, making S.H. feel helpless and afraid. S.H. knows that she cannot stop her child from having access to technology, and yet, she also now knows that Snap and companies like it are making sure that she has no way to keep her child safe.

188. S.H. now monitors her child's online activities relentlessly, and from a place of fear and helplessness. S.H. uses multiple security measures and is always looking for more and tries to exercise a degree of oversight that feels invasive, but necessary. She is doing far more than any parent should have to do and understands that it still may not be enough to protect her children from the most pervasive and effective predators of all—companies like Snap.

189. Once vibrant and carefree, O.H. is now withdrawn and fearful, especially around men. Her trust in others, once freely given, is guarded and hesitant. She has started taking medications for anxiety, depression, PTSD, and other harms caused by defendants and at issue in this case. S.H. has suffered financial strain from lost wages, exhausted vacation and sick leave, and took a leave of absence to support O.H. through the fallout of this ordeal.

190. O.H. is in counseling on a weekly basis and experiences struggles with school that she did not previously experience. O.H. feels embarrassed and ashamed, but also, she is angry that Snap not only did these things to her by design, but that it knows what is happening and is still designing and operating its product and features in a manner that is dangerous for young users. O.H. does not want other children to have to go through what she went through.

191. As a direct and proximate result of Defendants' criminal and tortious conduct,



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

Plaintiff O.H. sustained damages, including, but not limited to pain and suffering, anxiety, emotional distress, humiliation, and other economic and non-economic damages

192. As a direct and proximate result of Defendants' criminal and tortious conduct, Plaintiff O.H. suffered severe emotional distress in the form of physical, psychological, and emotional trauma.

193. As a direct and proximate result of Defendants' criminal and tortious conduct, Plaintiff S.H. sustained damages, including damage to her parent-child relationship and loss of consortium, and including grief, mental anguish, and suffering resulting from the harms caused, but also, invasion of privacy, interference with her parental rights, and Snap providing her home address to a predatory stranger without her knowledge or consent, all in amounts to be proven at trial.

194. Walter is facing criminal justice for his sexual exploitation and abuses of more than a dozen children facilitated through Snap's reckless and intentional design decisions, concerted action, reckless indifference, and willful disregard of the health and safety of its young users. Meanwhile, Snap and its leadership continue to profit from the sexual exploitation and abuse perpetuated on O.H. and hundreds of thousands of similarly situated children throughout the world while refusing to implement effective and available safety features or even to warn minor users and their parents of the defects and inherent dangerous of its platform.

**FIRST CAUSE OF ACTION**
**Sexual exploitation of children**
**18 U.S.C. §§ 2251 and 2255**

195. The paragraphs above are realleged as if fully set forth herein.

196. Acting in concert with Snap, Walter persuaded, induced, enticed, and coerced O.H., a minor, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct with knowledge that such visual depiction will be transported in interstate commerce.

197. Snapchat's design and features, such as Quick Add and Snap Map, encouraged and materially contributed to coercion of O.H. to engage in sexually explicit conduct and any


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

resulting visual depiction.

198. Snap knew that Walter's conduct violated federal law and gave substantial assistance to Walter so to conduct it. Snap's own conduct, separately considered, constitutes a breach of duty to O.H.

199. Plaintiffs suffered harms and losses as a proximate result of Defendants' violations of 18 U.S.C. § 2251. *See also* 18 U.S.C. § 2255.

**SECOND CAUSE OF ACTION**
**Advancing A Sexually Explicit Act by a Minor**
**RCW 9.68A.101**

200. The paragraphs above are realleged as if fully set forth herein.

201. Acting in concert, Walter and Snap knowingly caused and aided a sexually explicit act by O.H., a minor, provided premises for the purposes of a sexually explicit act of a minor, and engaged in conduct designed to institute, aid, cause, assist, or facilitate a sexually explicit act of a minor.

202. Snap knew that Walter's conduct violated Washington law and gave substantial assistance to Walter to conduct it.

203. Snap's own conduct, separately considered, constitutes a breach of duty to O.H.

204. Plaintiffs suffered harms and losses as a proximate result of Defendants' violations RCW 9.68A.101. *See also* RCW 9A.82.100; RCW 9.68A.130.

**THIRD CAUSE OF ACTION**
**Advancing Commercial Sexual Abuse of a Minor**
**RCW 9.68A.101.**

205. The paragraphs above are realleged as if fully set forth herein.

206. Snap has possession or control of a virtual premises which it knows was used for the purpose of commercial sexual abuse of O.H., a minor, and failed without lawful excuse to make reasonable effort to halt or abate such use and to make a reasonable effort to notify law enforcement of such use.

207. Plaintiffs suffered harms and losses as a proximate result of Defendants' violations RCW 9.68A.101. *See also* RCW 9A.82.100; RCW 9.68A.130.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

## FOURTH CAUSE OF ACTION
**Outrage**

208. The paragraphs above are realleged as if fully set forth herein.

209. Walter knowingly and intentionally groomed, exploited, and threatened O.H. and other minor users via the platform and tools Snap provided.

210. Snap knowingly and intentionally connected O.H. and Walter, lied to O.H. to entice her to connect privately with Walter (and other adult predators), and promoted sexual exploitation on Snapchat, which it also advertised as safe for children as young as 12.

211. Snap knowingly and intentionally solicited O.H. and similarly situated child users of Snapchat, knowing that they were prey to sex trafficking and related dangers that Snap itself was creating.

212. Snap knowingly and intentionally maintained a shoddy and broken reporting infrastructure so that sex trafficking and sexual abuse of minors grew.

213. In fact, in the first half of 2020 alone, Snap failed to review millions of "Sexual Content" reports prior to when it programmed and allowed its own systems to delete the evidence of such violations—some significant number of which related to the trafficking and abuse of minors. Worded otherwise, Snap claimed to have a working reporting mechanism but actually affirmatively deleted by design millions of reports of "Sexual Content" related violations, which spoliation it never disclosed to the public.

214. Despite actual knowledge that minor users are routinely connected to sex predators on Snapchat, Snap continues to advertise its product with brightly colored cartoons, to lure and groom children, including providing incentives and social rewards when children engage in such dangerous behavior, and Snap does so with full knowledge of the risks and harms it is causing.

215. The conduct of Walter and Snap, as described in this Complaint, went beyond all possible bounds of decency and can only be regarded as atrocious and utterly intolerable in a civilized society.

216. The conduct of Walter and Snap was extreme and outrageous.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

217. Through their extreme and outrageous conduct, Walter and Snap intentionally and/or recklessly caused Plaintiffs severe emotional distress, humiliation, embarrassment, and pain.

**FIFTH CAUSE OF ACTION**
**Negligence and Concert of Action**
**RCW 4.22.070(1)**

218. The paragraphs above are realleged as if fully set forth herein.

219. Snap performed a tortious act upon O.H. in concert with Walter.

220. Snap knew that Walter's conduct constituted a breach of duty and gave substantial assistance to Walter in accomplishing criminal and tortious acts.

221. Snap gave substantial assistance to Walter in accomplishing criminal and tortious acts and Snap's own conduct, separately considered, constitutes a breach of duty to O.H.

**SIXTH CAUSE OF ACTION**
**Strict Product Liability**
**RCW 7.72.030(1)(a)**

222. The paragraphs above are realleged as if fully set forth herein.

223. Snap designed, manufactured, marketed, sold, and distributed Snapchat as a commercial product intended for use by the public in the course of its regular business.

224. Snapchat is a mass-produced software application created by programmers for value to the general public via the App Store and GooglePlay. Snapchat is a tangible electronic and physical product because it takes up memory and visual space on electronic devices, can be moved around, opened, closed, turned on and off, installed and deleted. Snapchat accepts money and other value for the purchase of add-on features and descriptions. Although Snapchat carries no upfront cost to download or use in its "free" version, its distribution constitutes a sale because users pay by viewing advertisements and generating advertisement revenue for Snap, surrendering valuable personal data that Snap monetizes for commercial benefit, and unlocking paywalls and premium features through in-app purchases.

225. The commercial reality is that Snap places Snapchat into the stream of commerce and derives substantial revenue from user's engagement with the product.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

226. Snap is a "product manufacturer" under RCW 7.72.010(2).

227. Plaintiffs are "claimants" under RCW 7.72.010(5).

228. Plaintiffs suffered "harm" under RCW 7.72.010(6).

229. Snap, as a product manufacturer, is liable under RCW 7.72.030.

230. Snapchat was in a defective condition and was unreasonably dangerous when put to a reasonably anticipated use.

231. Snapchat was not reasonably safe as designed because, at the time of manufacture the likelihood that Snapchat would cause Plaintiffs' harms or similar harms, and the seriousness of those harms, outweighed the burden on Snap to design a product that would have prevented those harms and the adverse effect, if any, that an alternative design would have had on the usefulness of the product.

232. Snap acted far below the standard of care and custom in the industry in its protections for minor users against predators and exposure to defective and/or inherently dangerous products.

233. Among the unreasonable dangerous and defective designs at issue in this Complaint are the following:

a. Affirmatively connecting minor users with unknown adult strangers through its Quick Add design feature.

b. Misrepresenting unknown adult users as "Friends" and "people you may know."

c. Representing to minor users that connecting with strangers is what makes Snapchat fun and that doing so is safe.

f. Inducing minor users into accepting connections with unknown adult users through dark patterns and gamification.

g. Altering the appearance of users through Snap's Bitmoji and other related features designed to make those users appear safe, friendly, and approachable to minor users and, at times relevant, not even permitting users to use photos.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

h. Affirmatively directing minor users to harmful and exploitative content and connections through its recommendation technologies.

i. Failing to restrict adult user access to minor users via direct messaging.

j. Failing to limit such access to users already known to the minor user or present in the minor's device contacts.

k. Failing to employ working or effective reporting mechanisms.

l. Failing to deploy any meaningful safeguards to protect minor users from the foreseeable harms that result from connections with unknown adult users.

m. Deletion of material evidence of harms and crimes, even after notice of the same.

234. These design conditions render Snapchat unreasonably dangerous because ordinary, reasonable consumers, including minor users and their parents, would not expect that a social media platform represented and marketed as safe for children would knowingly direct those children to predatory adult users and manipulate them into trusting and connecting with such users.

235. These design conditions render Snapchat unreasonably dangerous because of the risks created by Snap's design, including the foreseeable grooming, trafficking, and sexual abuse of minor users, that substantially outweigh any benefit those design conditions provide.

236. Design changes were technologically feasible and available, but Snap chose to not implement them. The cost of implementing such alternatives would have been negligible, while the benefit to minor users would have been substantial. The following are just some examples of design changes that were available to Snap at all times relevant:

a. Designing platform technologies that do not direct minor users to unknown adults.

b. Disabling Quick Add and similar recommendation design features by default for minor user accounts.

c. Disabling Snap Map by default for minor accounts.

d. Restricting direct messaging to users already present in a minor user's confirmed contact list.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

e. Removing location-based and school-based factors from Snapchat's recommendation algorithms.

f. Limiting adult user access to minor user accounts and profiles.

g. Designing Snapchat in a manner that does not alter or misrepresent user age and appearances or otherwise strip adults of the identifying characteristics that minor users rely on to recognize danger.

h. Requiring users to document or verify their age or identity at registration.

i. Extending Snap's existing age-estimation technologies to safety and access control functions.

j. Implementing mandatory lockout periods following failed age verification attempts.

k. Deploying multi-account detection technologies to identify and restrict users evading prior enforcement action.

l. Applying Snapchat's Terms of Service enforcement mechanisms in the manner Snap represents to users that it does.

m. Requiring verifiable parental consent for users under 18.

n. Enforcing its prohibition on users under the age of 13.

o. Providing parents with tools to monitor their child's contacts and restrict communications to known users.

p. Implementing notifications to parents when their child is contacted by unknown adult users or when inappropriate content is transmitted to their child's account.

q. Preserving communications on the back end to enable parental review and law enforcement access.

r. Designing parental control features that provide meaningful oversight.

237. Snapchat was not in compliance with industry standards, with legislative regulatory standards, or administrative regulatory standards with regard to its design.

238. The cost of implementing these reasonable alternative designs would have been


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

negligible while the benefit—measured by the reduction in exploitation, psychological harm, and physical injury to minor users—would have been substantial.

239. The unreasonably dangerous and therefore defective conditions present in Snapchat existed at the time Snapchat left Snap's control and reached the minor plaintiff without any substantial change

240. Snapchat was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

241. An ordinary consumer, including minors, adolescents, and parents, would not expect that a product marketed as safe for children was designed to connect minor users with unknown adult strangers, manipulate those users into trusting those strangers, provide strangers with minor users' location data without their knowledge or consent, and destroy evidence of their communications.

242. The minor plaintiff used Snapchat in a reasonably anticipated manner in that she was a minor user engaging with the platform's core features in the way Snap designed, marketed, and intended its product and those features be used.

243. Snapchat was defectively designed in that the foreseeable risks exceeded the alleged benefits associated with its design.

244. Plaintiffs suffered harms and losses as a proximate result of the not reasonably safe design of Snapchat.

## SEVENTH CAUSE OF ACTION
### Product Liability - Inadequate Warnings
### RCW 7.72.030(1)(b) and (c)

245. The paragraphs above are realleged as if fully set forth herein.

246. Snap failed to provide warnings to the minor plaintiff regarding any of the defects and inherent dangers described herein. To the contrary, Snap repeatedly represented to her, and other minor users like her, as well as parents, schools, law makers, and governments around the world, that its products were safe and fun for children, and actively marketed them as such to children.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

247. The minor plaintiff was aware of these representations, which she saw online, via accounts used by her friends, and advertisements touting the silly Snapchat filters. She reasonably relied on Snap's representations, which Snap knew to be false and materially misleading, and which were made for the purpose of inducing consumers, like and including the minor plaintiff, to continue using its products.

248. Plaintiffs identify the following as examples of warnings Snap could have provided but did not:

a. Snapchat is not safe or appropriate for minors. It was developed primarily as a sexting app, and the disappearing nature of its product features can create a dangerous situation for vulnerable users.

b. Snapchat will connect users with people they do not know in real life, and may even connect users with persons who are dangerous; Quick Add selections and other features are designed to connect users with as many other Snapchat users as possible, even if users do not know them and even in instances where the other user may be an adult, may live in another state or country, may be lying about their age or location, and may even be someone that other Snapchatters have reported for violations of Snap's rules and terms.

c. Just because Snapchat refers to someone as a "friend," that does not mean that a user knows them or that they are safe.

d. Snapchat users that a user does not know in real life is not a "friend," and connecting with unknown users is dangerous.

e. These dangers are amplified by use of the Snap Map feature, as this feature may result in Snap providing strangers with a user's precise, physical location, which will inform strangers where a user lives and/or works, what school a user attends, and/or where a user is at any given moment.

f. Snapchat frequently does not act in response to user reports of violations or harmful conduct; it often does not report known illegal activity to law


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

enforcement; sometimes it does not even review the reports it receives of violations and/or illegal activity prior to its systems deleting the subject matter of the report. Users cannot rely on Snapchat's reporting features or assume that they work. Likewise, a recommendation to connect with another user does not mean that the user has not previously violated Snapchat's Terms of Service or engaged in illegal and/or predatory conduct via the Snapchat platform.

g. Opening a snap or other communication on Snapchat from an unknown user may result in receipt of unsolicited explicit material.

h. Accepting Quick Add selections for users not known in real life may result in the receipt of unsolicited explicit material, and similar harms. While Snapchat is colorful and offers rewards for interacting with other users, connecting with people not known in real life is not a game. It is dangerous and can result in serious harms.

i. Snapchat does not provide settings or features to protect against the above-described harms.

j. Snapchat is not safe.

249. Had Snap provided warnings of this nature, or reasonably equivalent disclosures, a substantial number of minor users and/or their parents would have made the informed decision to not use Snapchat, to not accept Snap's friend selections, to not allow any use of Snap Map, and/or taken similar measures to minimize the terrible risks attendant in the use of Snapchat as currently designed and operated. This minor plaintiff, for one, would not have engaged with the platform in the manner that led to the harms described herein.

250. Snapchat was not reasonably safe because adequate warnings and instructions were not provided with the product at the time of manufacture, it was likely that the product would cause the plaintiffs' harms or similar harms, and Snap could have provided adequate warnings or instructions. *See* RCW 7.72.030(1)(b).

251. Snapchat was unreasonably dangerous when used as reasonably anticipated without knowledge of its characteristics.

252. Snap possessed unreasonably dangerous conditions including its capacity to connect minor users with unknown predatory adults, to facilitate the grooming, exploitation, and sexual abuse of minor users, and to expose minor users to physical and psychological harm through foreseeable use of the product.

253. Snapchat was not reasonably safe because Snap negligently failed to provide adequate warnings or instructions after Snapchat was manufactured even as Defendant gained notice and knowledge of the atrocities committed on and enabled by its product. *See* RCW 7.72.030(1)(c).

254. Snap knew of Snapchat's unreasonably dangerous conditions through its internal research, user reports, and other technological capabilities.

255. Snap failed to exercise the care of a reasonably prudent manufacturer in the same or similar circumstances in its warnings and instructions to users post-manufacture.

256. Snapchat was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

257. Ordinary consumers, including minor users and their parents, do not possess and cannot reasonably obtain equivalent knowledge of Snapchat's unreasonably dangerous characteristics. The risks posed by Snapchat's design are distinct from and far more serious than any general risk to minors that may be known to the public, and Snap's affirmative representations that Snapchat was safe for use by children made it impossible for ordinary consumers to appreciate those risks absent adequate warnings.

258. The minor plaintiff used Snapchat in a reasonably anticipated manner, engaging with the platform's core features in the way Snap designed, marketed, and intended its product to be used, and without knowledge of the unreasonably dangerous characteristics those features harbored.

259. Snap knew or should have known that harm to minor users would occur absent adequate warnings.

260. Snap failed to warn users or their parents of all of the defects set forth above, and


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

the absence of adequate warnings rendered Snapchat unreasonably dangerous.

261. Plaintiffs suffered harms and losses as a proximate result of Snapchat's inadequate warnings and instructions.

**EIGHTH CAUSE OF ACTION**
**Negligent Design**

262. The paragraphs above are realleged as if fully set forth herein.

263. Snap owed a duty to exercise reasonable care for the safety of individuals using its products, including O.H.

264. Snap owed a heightened duty of care to minor users of its products because adolescents' brains are not fully developed, resulting in a diminished capacity for sound decision-making, reduced ability to resist compulsive or self-destructive behaviors, and heightened susceptibility to emotional and psychological harm.

265. As a product manufacturer that markets and distributes its products to consumers, Snap owed a duty to exercise ordinary care in the design, manufacture, marketing, and distribution of its products, including a duty to warn minor users and their parents of hazards Snap knew to exist but that were not known or reasonably discoverable by underage users and their parents.

266. As the owner and operator of a commercial platform from which it derives billions of dollars in annual revenue, Snap owed its users a duty of ordinary care substantially equivalent to that owed by business owners to its business invitees.

267. Snap has reasonable duties of care and breached its duties of care and was negligent, grossly negligent, and/or reckless in one or more of the following respects:

a. Failing to conduct adequate testing of its products and product features.

b. Failing to provide adequate warnings regarding the dangers associated with use of its products.

c. Failing to advise minor users about the risks inherent in the use of its products and features.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

d. Failing to adequately assess, investigate, and restrict the ability of adult users to access, contact, and exploit minor users through use of its products.

e. Failing to provide users and parents with functional and accessible reporting mechanisms.

f. Failing to enforce its Terms of Service upon receiving notice of unlawful conduct and violations.

g. Designing its Bitmoji feature in a manner that enables and effectively requires users to present themselves through cartoon avatars that conceal their true age, appearance, and identity—a design that Snap knew would be exploited by predatory adults to gain the misplaced trust of minors.

h. Failing to maintain a safe and orderly environment appropriate for children.

i. Failing to maintain adequate staff and technology to ensure the operation of product features as represented.

j. Snap's negligent acts and omissions were the direct and proximate cause of the injuries sustained by Plaintiffs. But for Snap's breach of its duties of care, Snapchat predators would not have been able to identify, access, coerce, or harm the minor plaintiff.

## NINTH CAUSE OF ACTION
## Negligent Failure to Warn

268. The paragraphs above are realleged as if fully set forth herein.

269. Snap owed a duty to exercise reasonable care for the safety of individuals using its products, including O.H.

270. Snap owed a heightened duty of care to minor users such as O.H. because adolescents' brains are not fully developed, resulting in a diminished capacity for sound decision-making, reduced ability to resist compulsive or self-destructive behaviors, and heightened susceptibility to emotional and psychological harm.

271. Snap knew, or in the exercise of reasonable care should have known, that O.H.


SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

faced an unreasonable risk of being connected to adult sexual predators through her anticipated use Snapchat yet failed to furnish adequate warnings to either O.H. or her parents of this clear and present danger.

272. As a proximate result of Snapchat's inadequate warnings, O.H. was subjected to sexual exploitation on Snapchat.

**TENTH CAUSE OF ACTION**
**Unjust Enrichment**

273. The paragraphs above are realleged as if fully set forth herein.

274. Snap's advertising revenue is directly tied to the number of user accounts and time spent on Snapchat. Snap derived a direct financial benefit from O.H.'s use of its products and from the continued engagement of Walter and the broader class of predatory users whose access Snap's design enabled and encouraged.

275. Snap was enriched by the receipt of a benefit at the expense of Plaintiffs, and it would be unjust to allow Snap to retain such benefit.

276. O.H. suffered detriment.

277. Snap's retention of profits derived from O.H.'s unauthorized use of Snapchat violates fundamental principles of justice, equity, and good conscience and it would be unjust and inequitable for Snap to retain financial benefits obtained at Plaintiffs' expense.

278. Plaintiffs seek restitution and disgorgement of Snap's ill-gotten benefits, together with such other damages as may be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**Invasion of Privacy**

279. The paragraphs above are realleged as if fully set forth herein.

280. Snap intentionally and unreasonably intruded upon the seclusion and private affairs of Plaintiffs by knowingly designing its product to exploit O.H.'s private, personal information and communications and by deliberately frustrating the ability of S.H. to prevent,



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

monitor, or control her underage child's use of its product.

281. These intrusions are highly offensive to a reasonable person, particularly given Snap's exploitation of minor's vulnerabilities for commercial gain and its systematic interference with the fundamental right to parent.

282. The matters upon which Snap intruded were private in that they included the minor plaintiff's personal communications, intimate and personal affairs relating to her bodily autonomy and physical person, her location and usage data, and the private parent-child relationship, and Plaintiffs had a right to keep these matters private.

283. Plaintiffs suffered as a direct and proximate result of Snap's intrusions.

284. Plaintiffs seek damages in amounts to be determined at trial, as well as injunctive relief requiring Snap to cease the harmful practices described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request the Court to enter judgment as follows:

1. For a judgment of liability jointly and severally against Snap, Inc. and Glenn Walter;

2. For economic damages in an amount to be proven at trial;

3. For non-economic damages including pain, suffering, mental anguish and disability in an amount to be proven at trial;

4. For costs and attorney fees pursuant to 18 U.S.C. § § 2255, RCW 9A.82.100 and RCW 9.68A.130 and any other appropriate provision.

5. For punitive damages as provided by law.

6. For injunctive relief requiring Snap to cease the harmful practices described herein.

7. For such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial on all causes of action.



SOCIAL MEDIA VICTIMS LAW CENTER
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

**DATED** this 2nd day of November, 2026

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

*/s/ Matthew P. Bergman*
Matthew P. Bergman, WSBA No. 20894

Matthew P. Bergman, WSBA No. 20894
matt@socialmediavictims.org
Laura Marquez-Garrett, WSBA No. 41010
laura@socialmediavictims.org
Glenn Draper, WSBA No. 24419
glenn@socialmediavictims.org
Katie Fairchild, WSBA No. 47712
katie@socialmediavictims.org
600 1st Avenue, Suite 102-PMB 2383
Seattle, WA 98104
P: 206- 741-4862

*Attorneys for Plaintiffs*